**UNITED STATES of America,
Appellee,**

v.

**Enrique SANCHEZ, Appellant.**

**No. 1030, Docket 73–1452.**

United States Court of Appeals,
Second Circuit.

Argued July 17, 1973.

Decided Aug. 27, 1973.

E. Thomas Boyle, New York City (Robert Kasanov, The Legal Aid Society, New York City, on the brief), for appellant.

Myles C. Cunningham, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty., E. D. N. Y., L. Kevin Sheridan, and James A. Pascarella, Asst. U. S. Attys., on the brief), for appellee.

Before MOORE and OAKES, Circuit Judges, and GURFEIN,* District Judge.

MOORE, Circuit Judge:

Enrique Sanchez appeals from a judgment of conviction entered after trial by jury in the United States District Court

---

* Hon. Murray I. Gurfein, United States District Judge for the Southern District of New York, sitting by designation.

for the Eastern District of New York. Appellant was found guilty on all three counts of an indictment that charged him and co-defendant Rafael A. Duarte, Jr., with: (1) conspiracy to extort a sum of money by transmitting in interstate commerce communications containing threats to injure the reputation of Dr. Roberto Sanchez, in violation of 18 U.S.C. § 875, and the laws of New Jersey and New York under 18 U.S.C. § 1952(a)(2) and (3); (2) use of a facility in interstate commerce with the intent of committing extortion; and (3) transmission in interstate commerce of communications containing threats to injure the reputation of Dr. Sanchez. On appeal appellant raises two claims: (1) that the trial court deprived him of his Sixth Amendment right to the effective assistance of counsel and to counsel of his own choosing; and (2) that he is entitled to a hearing to determine whether his conviction was tainted by an unlawful electronic surveillance. We reject both contentions and affirm the judgment of conviction.

The relevant facts, briefly stated, are as follows. On an evening in mid-June of 1971, Dr. Roberto Sanchez (unrelated to appellant), pursuant to a scheme planned by appellant, Duarte, and one Amado Alfonso, went to appellant's apartment in Union City, New Jersey.[1] Present at the apartment were appellant, Alfonso, and, hiding in a bedroom closet with a camera and pistol, Duarte. After a brief conversation among the doctor, appellant, and Alfonso, appellant left the apartment; Doctor Sanchez and Alfonso remained. The two men then went into the bedroom where Duarte was hiding, undressed, and proceeded to engage in homosexual activity. At a prearranged signal from Alfonso, Duarte came out of the closet and, threatening to use the pistol, photographed the doctor and Alfonso engaging in homosexual acts.[2]

In the weeks following this incident, the doctor received numerous (anonymous)[3] threatening telephone calls at his home in New Jersey and at his office in Brooklyn, New York. He was informed that unless he paid a sum of money ranging from $35,000 to $55,000, the photographs would be released to his family and friends, and his reputation would be ruined. The doctor was sent copies of the photographs, as well as a copy of the community Cuban newspaper in which an article had appeared (based on information provided by appellant) describing photographs that depicted the "strange passions" of an unnamed local doctor. (Trial Transcript, hereinafter "Tr.", at 281–86).[4]

Approximately two to three months thereafter, upon the advice of his attorney, Dr. Sanchez recorded several of the threatening telephone calls and took the tapes to the FBI; the doctor also provided the FBI with the photographs he had been sent and the Cuban newspaper which had referred to the incident. On September 23, 1971, in a recorded telephone conversation, the doctor was instructed to deliver $35,000 in cash to a Union City, New Jersey, restaurant, where appellant was then employed. On September 27, 1971, Dr. Sanchez, followed by FBI agents, drove to the parking lot of the restaurant with an envelope containing $2,000 in cash. The bills had been photocopied by the agents (for purposes of later identification) and Dr. Sanchez had been "wired" with an electronic transmitter for the purpose of enabling the FBI agents to overhear any

---

1. Dr. Sanchez and appellant had known each other for many years, since appellant's youth.

2. At trial Dr. Sanchez testified that he and Amado Alfonso had been forced at gunpoint by Duarte to go into the bedroom, disrobe, and pose engaging in homosexual acts.

3. The caller was later identified to be co-defendant Rafael Duarte, Jr. (See Tr. 510).

4. References to the transcript of trial for the first four days of the six-day trial will be to "Tr.". Since, however, the pagination for the transcript of the last two days of trial was begun again at page "1", references to the transcript of those two days will be preceded by the date "9/6/72".

conversation he might have with the blackmailers.

At the restaurant, FBI agents took surveillance positions around the area. One agent, in possession of the receiver portion of the transmitter set carried by the doctor, was stationed in a store near the restaurant. Another agent moved in and out of that store, alternately listening to the transmissions picked up on the receiver, if any, and walking to the parking lot to observe Dr. Sanchez in his parked auto. After some time, appellant walked out of the restaurant and to the doctor's vehicle. After a brief exchange, during which appellant looked furtively in all directions (Tr. 312, 9/6/72 Tr. 103), appellant went to his own auto and drove it to a position near that of the doctor. He then returned to the doctor's vehicle, took the envelope containing the $2,000 in cash from the doctor, and returned to his vehicle to depart. The FBI agents promptly arrested appellant.

Just prior to trial, co-defendant Duarte pleaded guilty to Count I of the indictment and later testified at appellant's trial. Appellant took the stand in his defense and denied any involvement in the conspiracy to extort money from Dr. Sanchez. He testified that he had taken the $2,000 from the doctor only as an intermediary upon the doctor's request, and that he was to hold the money until contacted by an unknown third party who, in return for the cash, would give appellant (on the doctor's behalf) the photographs and negatives. After deliberation the jury found appellant guilty on all counts of the indictment. He was subsequently sentenced to concurrent terms of imprisonment totalling four years.

Appellant's first argument on appeal is that he was deprived of his Sixth Amendment right to the assistance of counsel by the actions of the trial court. Specifically, appellant alleges that (1) he was denied counsel of his own choosing, and (2) he was denied the effective assistance of counsel when the court ordered appellant's two counsel to proceed to trial, allegedly without adequate preparation on their part. A brief factual background is necessary in order to measure the merit of these contentions.

The indictment against appellant was filed on December 23, 1971, at which time Mr. Phillip Brown was appointed as his defense counsel. Appellant thereafter also retained the services of another counsel, Mr. Andres Astacio Santos. At his arraignment appellant was represented by attorney Brown. On January 13, 1972, appellant, represented by attorney Santos, pleaded not guilty to the charges. The docket record shows that the case was first called before Judge Bartels on February 4, 1972, and that it was adjourned to February 10, 1972. On that date the case was again adjourned until February 18, 1972; the government filed notice of readiness for trial on February 15, 1972. On February 18 appellant (by attorney Santos) withdrew his motion for inspection and a bill of particulars, which had been filed by Mr. Santos on January 26, 1972. On July 12, 1972, Judge Bartels called the case and set trial for August 14, 1972; it was again adjourned, however, with trial commencing on August 28, 1972.

On that date both (assigned) attorney Brown and (retained) attorney Santos appeared in court. Mr. Brown apparently was entering an appearance officially to withdraw as appellant's counsel, since Mr. Santos had been retained by appellant, and since Mr. Brown had failed to file an order of substitution with the court. With no advance notice to anyone, however, Mr. Santos also made application for permission to withdraw as counsel, on the ground that some ten months prior to trial, and prior to his retention by appellant, he had suffered a broken ankle and that, as a result thereof, he "had an emotional problem" and lacked a "clear mind." (Tr. 14). Judge Bartels, after some discussion, denied the applications to withdraw, ordered the trial to proceed, and directed both counsel to discuss the handling of the trial with each other and with appellant. (Tr.

15, 16). After accepting the guilty plea of co-defendant Duarte, Judge Bartels inquired of the two counsel which of them would try the case. Attorney Brown informed him:

> I have discussed it with the defendant [Enrique Sanchez] and my colleague [attorney Santos] and we are going to try it together. I will try it; he will sit in, if it's all right with the Court and the defendant. (Tr. 30).

Judge Bartels then indicated, "All right, both of you will try it. That's fine", to which Mr. Brown responded, "That will be under the original assignment." (Tr. 30–30A).

A luncheon recess was then called, after which a jury was empaneled to hear the case. During the ensuing six-day trial, Mr. Brown conducted the defense with Mr. Santos sitting at the defense table, providing consultation and interpreting for the Spanish-speaking defendant.

██ Appellant here alleges that he was denied counsel of his own choosing when the court permitted Mr. Brown to represent him, since he had manifested his desire not to be represented by Mr. Brown when he retained Mr. Santos as his attorney. Moreover, argues appellant, he was not aware of the pre-trial switch in attorneys since "he [had] stood by in dumb silence" without the services of a Spanish interpreter during discussion among counsel and the court. (Brief, hereinafter "Br.", at 12). We find no merit in appellant's contentions.

The record shows that the trial court and the government took more than adequate precaution to insure that appellant was represented by counsel, and that he was made completely aware during the pre-trial discussion of the situation regarding his trial representation. In addition to the appointment of counsel with Spanish-speaking ability (Mr. Brown) (Tr. 32), appellant was also provided with a Spanish interpreter from the commencement of the pre-trial discussion between counsel and the court. (Tr. 8). Appellant himself later agreed to dismiss the interpreter, since both his counsel spoke Spanish, and since Mr. Santos would sit at the defense table with appellant throughout the trial. (Tr. 32). There was also evidence that appellant, aged 34, residing in this country since 1958, and having served in the United States Army, had facility with the English language; he was able to respond to the trial court during the trial that he was understanding "everything that [had] gone on." (Tr. 119).[5]

We fail to see how appellant could have "stood by in dumb silence" unaware of what was transpiring at pre-trial as regards which of his two counsel would try the case, when there were present not one, but three, Spanish-speaking persons to explain the proceedings to appellant, and when he himself knew English well enough to understand. We therefore find no error as regards the requirement that a defendant be provided with an interpreter when necessary. *United States ex rel. Negron v. New York*, 434 F.2d 386, 390 (2d Cir. 1970). *See United States v. Diaz Berrios*, 441 F.2d 1125, 1126–1127 (2d Cir. 1971). Nor, more importantly, do we find that the trial court erred in directing counsel to proceed to trial. It is obvious that during the many months prior to trial, and during trial, appellant had the services of not one, but two, attorneys. As noted above, Mr. Brown informed the court that he had discussed the matter with both appellant and his co-counsel, and that all three had agreed to proceed to trial under the arrangement outlined by Mr. Brown. It ill-behooves appellant to argue on appeal that he was denied counsel of his own choosing when in fact, the record shows that he consented to the arrangement, and that both his retained and appointed counsel jointly represented him at trial.

---

5. At the sentencing hearing appellant had no difficulty discussing with the court (in English) particulars regarding an appeal. See Transcript of Hearing, Nov. 17, 1972, at 11.

Equally without merit is appellant's second Sixth Amendment argument, wherein he alleges that he was deprived of the effective assistance of counsel when the trial court directed defense counsel to proceed to trial on August 28, 1972, as had been scheduled by the court on July 12, 1972—some six weeks previously, and over seven months from the date of arraignment. It is clear that counsel had more than ample time to prepare for trial in the months preceding August 28, 1972, and that the court was justified in directing counsel to decide which of them would try the case, in view of the fact that neither attorney had given any indication prior to August 28th that he would seek permission to withdraw. Be that as it may, however, our inquiry does not end there, for a defendant is not lightly to be penalized for the lack of assiduousness on the part of counsel upon whom he relies. In situations wherein a defendant alleges ineffective assistance of counsel, we must determine whether counsel's overall representation of defendant (whether through counsel's own performance, or as it is affected by the actions of the trial court) was "so woefully inadequate 'as to shock the conscience of the Court and make the proceedings a farce and mockery of justice.'" United States v. Currier, 405 F.2d 1039, 1043 (2d Cir.), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969), *quoting* United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950).

Reading the record as a whole, we cannot conclude that appellant's trial was a farce, nor do we find representation of counsel or judicial actions relating thereto such as would shock the conscience of this Court. On appeal Sanchez points to four acts of commission or omission which, he alleges, demonstrate that his counsel rendered, or as a result of trial court rulings was caused to render, ineffective representation: (1) counsel failed to request a bill of particulars from the government detailing the specific provisions of the New Jersey and New York state laws which the indictment charged appellant with having violated (Br. 21); (2) counsel prior to trial failed to move for suppression of, and during trial failed to object to, certain statements made by appellant to an FBI agent after his arrest (Br. 22); (3) counsel failed to call certain witnesses, as a result of court rulings, who were "essential to" appellant's case (Br. 23); and (4) counsel failed to request a hearing as to whether the government had conducted an unlawful electronic surveillance at appellant's place of work, an issue which we discuss in detail *infra,* under appellant's second major argument on appeal (Br. 22–23).

As regards counsel's alleged failure to request a bill of particulars, we noted *supra* that appellant's counsel (Mr. Santos) in fact did make such a request on January 26, 1972, and that he later withdrew the request on February 18, 1972. Moreover, we also note that the indictment is sufficiently detailed, with specific reference to both the federal and state extortion laws appellant was charged with having violated, so that a bill of particulars would have served little purpose. In short, we see no merit to the argument that defense counsel erred in not requesting a bill of particulars.

As to the argument that defense counsel failed to move for suppression of, and at trial failed to object to, statements made by appellant to the arresting agent, which were admitted into evidence, we find good reason for counsel's actions. The record shows that a motion to suppress would have been unavailing since the arresting officer, Agent Brana (who spoke Spanish fluently), had advised appellant in Spanish of his constitutional rights both upon arrest and again at FBI headquarters prior to questioning. At headquarters appellant was provided with a form (printed in Spanish) which explained his constitutional rights, and to which he affixed his signature. Regardless of the

fact that this waiver was not introduced into evidence, it is evident that the waiver was valid, that appellant's statements were admissible, and that therefore failure of counsel to move for their suppression did not prejudice appellant. *See* United States v. Pacelli, 470 F.2d 67, 72 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973) ; Massimo v. United States, 463 F.2d 1171, 1173 (2d Cir. 1972), cert. denied, 409 U.S. 1117, 93 S.Ct. 920, 34 L. Ed.2d 700 (1973).

Appellant's other contention relating to inadequacy of counsel is that, because of counsel's unpreparedness for trial, necessary witnesses were not called on behalf of appellant. The witnesses not called were Maria Goicochoea, appellant's aunt, who was a terminal leukemia patient in a Jersey City, New Jersey, hospital at the time of trial; and a witness from Miami, Florida, named Altimo Perez. Appellant argues that defense counsel should have obtained the deposition of Maria Goicochoea, and that the court erred in denying a continuance so that Perez could come up from Miami to testify.

▉ The record shows that defense counsel had ample time prior to and during the six-day trial (which included a three-day Labor Day weekend) to depose the witness Goicochoea. It is unclear precisely what the value of her testimony would have been. At trial it was alleged that Dr. Sanchez had gone to see her right after the sordid photographing incident occurred, and that what the doctor had told her about the incident was at variance with his trial testimony that Duarte had forced him at gunpoint to engage in homosexual activity with Amado Alfonso. Even if it be assumed that the testimony of Maria Goicochoea would have been offered to impeach that of Dr. Sanchez, failure to depose her evidences no error, since impeachment was accomplished on the government's own case when both Duarte (who had pleaded guilty) and Alfonso testified at variance with the doctor's trial testimony.

▉ As to the Miami witness, even though the trial court did deny defense counsel's request for a continuance in order to await the arrival of Perez (made on September 6th), on the ground that counsel could make no offer of proof as to the witness (9/6/72 Tr. 100), the record shows that the trial was nonetheless adjourned until September 8th for other reasons. Defense counsel thus had time either to bring the witness into court (counsel had represented on September 6th that the witness was already on his way up from Miami (9./6/72 Tr. 99)) ; or to interview the witness by telephone so as to be able to make an offer of proof to the trial court in support of a continuance request. Counsel apparently chose neither course, for reasons not reflected in the record. What the record does reflect, however, is that at no time did defense counsel demonstrate the relevancy or materiality of Perez' potential testimony. We thus question appellant's description of the testimony that might have been offered by either Maria Goicochoea or Altimo Perez as being "essential to" the defense; more importantly, however, we fail to see any prejudice to appellant from the non-appearance of either of those persons.

We have considered carefully each of appellant's allegations on the adequacy of counsel issue, and his arguments in support thereof, and we conclude that neither individually nor collectively do they give rise to a meritorious claim of ineffective assistance of counsel meeting the standard set forth in United States v. Wight, *supra*.

▉ Appellant's other point of error on appeal relates to the contention that defense counsel should have requested, and that the trial court erred in not conducting, a hearing pursuant to 18 U.S.C. § 2518(10)(a) to determine whether the government used information at trial which had been derived from an electronic surveillance allegedly conducted at the restaurant where appellant was employed as a waiter. This argument presupposes that, in addition to the electron-

ic surveillance conducted by means of the transmitter carried by Dr. Sanchez, use of which is not here challenged, the government also conducted electronic eavesdropping at the restaurant, a supposition which is simply not supported in the record.

Appellant bases his contention, as best we are able to determine, solely on a piece of trial testimony by FBI Agent Paul J. Brana. As taken out of context, Agent Brana's statement regarding the events at the restaurant leading to appellant's arrest, upon which appellant relies was as follows:

> Well, I was across the street and I was listening to part of a conversation because he was in and out of the particular store where our receiver was, to see if there was possibly another accomplice in the area. (Tr. 313).

Appellant urges that by "store" the agent was referring to the restaurant, and by "he" the agent was referring to the appellant; thus, argues appellant, the agent's statement establishes that an electronic surveillance was conducted at the restaurant, notice of which appellant was required to be given before trial under 18 U.S.C. § 2518(9).

Our reading of the record, and specifically the testimony of Agent Brana in its entirety (Tr. 300–67, 9/6/72 Tr. 102–12), leads us to a contrary opinion. As noted above, the FBI agents had positioned themselves in the vicinity of the restaurant. One agent, who had possession of the receiver part of the transmitter set with which Dr. Sanchez had been outfitted, was stationed in a store near the restaurant, the "store" alluded to in Agent Brana's testimony. Brana himself went in and out of that store, alternately listening to the receiver and walking to the parking lot to observe Dr. Sanchez in his parked auto. The trial testimony of Agent Brana that precedes and follows the passage relied upon by appellant leads us to conclude that, as argued by the government, "store" does not refer to the restaurant, and "he" in the passage, when viewed in context with the rest of the testimony, should read "I"; use of the word "he" resulted either from an error by the court reporter in transcribing Agent Brana's testimony, or from the agent's own confusion as to pronoun use. In either case, the passage does not establish, as appellant alleges, that the government conducted *any* electronic surveillance, lawful or unlawful, in appellant's place of work. Therefore appellant's second claim on appeal, like his first claim, is unmeritorious.

Finding no error in the proceedings below, we affirm.

OAKES, Circuit Judge (concurring):

I concur in the result.