UNITED STATES of America

v.

William SANGEMINO, Defendant.

No. 74 Cr. 928–CLB.

United States District Court,
S. D. New York.

Sept. 25, 1975.

Paul J. Curran, U. S. Atty., by Jeffrey Harris, Asst. U. S. Atty., New York City, for plaintiff.

Michael B. Pollack, New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

On April 18, 1975, the jury returned guilty verdicts on each of three counts against the defendant William Sangemino, a Major in the United States Army Reserve. The three counts charged the defendant with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; with having accepted a bribe as a public official of the United States, in violation of 18 U.S.C. § 201(c); and with having made a material false statement before the grand jury, in violation of 18 U.S.C. § 1623.

At the times relevant here, defendant was on active duty status, assigned to the New York City Headquarters of the Selective Service System, in the capacity of "assistant chief of the field division" and later as Manpower and Training Division Chief. (Trial transcript ["Tr."] pp. 813–14). His duties, as described by him and his superior, included responding to inquiries from Selective Service registrants, the general public and public officials, lecturing to organizations and school groups, and handling relations with dignitaries concerned with Selective Service operations in New York City.

On June 30, 1975, defendant, represented by new counsel, moved for an order, pursuant to Rule 33, F.R.Crim.P., granting him a new trial. Defendant, by his new counsel, contends that a new trial should be granted "in the interest of Justice" because the defendant was deprived of the effective assistance of counsel in that his trial counsel failed to represent him competently. Defendant also contends that he is entitled to a new trial because the Assistant United States Attorney failed to disclose exculpatory material, in violation of the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

I

We turn first to defendant's claim of ineffective assistance of counsel. A determination of the effectiveness of defense counsel's representation cannot be made in the abstract. The measure of counsel's effectiveness must be evaluated in the context of the case as it unfolded before the jury. *United States v. Katz*, 425 F.2d 928 (2d Cir. 1970). There are many criminal cases in which even the most persuasive advocate or the most adept practitioner cannot prevail. Against the strength of the prosecutor's case, even the most able defense counsel may be unable to dispel the image of the smoking gun, or silence the ringing testimonial accusation of a victim, which becomes set in the minds

of the jurors. The appropriate way to begin our inquiry, therefore, is by examining the strength of the prosecution's case. *United States ex rel. Marcelin v. Mancusi,* 462 F.2d 36 (2d Cir. 1972), *cert. denied,* 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973).

A significant portion of the Government's case was introduced through the testimony of an unindicted co-conspirator, Nathan Lemler. Lemler testified that he had been retained by young men or their parents in 401 cases to provide assistance in obtaining Selective Service deferments, or compassionate discharges or reassignments from the armed forces. As to 400 of these, he says he succeeded.

Lemler first met Major Sangemino in 1968 in Sangemino's office when, in connection with a college and graduate school placement service Lemler operated, he made an innocuous inquiry of defendant at Selective Service headquarters in Manhattan. Sangemino answered the inquiry in a manner considered helpful by Lemler. Lemler testified that he then said to Sangemino that he would like to make a contribution to Sangemino's favorite charity, and placed three $100.00 bills in a two-tiered mail basket on Sangemino's desk. It was Lemler's testimony that Sangemino escorted him to the elevator, with his arm around Lemler's shoulder, and said that if Lemler ever had a Selective Service or military problem, he was certain that he could handle it. The Government presented its case against Major Sangemino by focusing on five of Lemler's cases.

Lemler testified in detail about the charades he orchestrated to obtain a compassionate reassignment to stateside duty for Major Gerald Weiss, and a compassionate discharge from the Army for David Zweibel. In both instances, Lemler testified that, with the advice of Major Sangemino, a close member of the soldier's family staged a fraudulent suicide attempt and was, thereafter, temporarily confined at South Oaks Mental

Hospital on Long Island, New York under the care of Dr. Teitelbaum, a psychiatrist named as a co-conspirator. Both scenarios achieved their desired results of relieving the soldiers of the possibility of assignment to duty in Vietnam. Lemler testified that he paid Sangemino $1,000.00 or $1,200.00 for his helpful advisory role in the Weiss case, and $800.00 for his part in the Zweibel case.

Lemler testified that a similar scenario had been staged for the benefit of Lieutenant Joseph Petro. It was arranged with Dr. Teitelbaum to invent a history of emotional disorders for the Lieutenant's mother; thereafter, she was admitted to South Oaks as a patient of that psychiatrist. Lemler failed in this attempt to obtain a discharge or reassignment for Petro. Lemler testified that he paid Sangemino $1,000.00 in connection with this attempt. Lemler testified that, when he was requested by Petro's parents to make a second attempt, he consulted with Sangemino who arranged for a conference between Lemler and Lieutenant Petro, and a Colonel Nicholson at the Pentagon. Sangemino provided Lemler with his business card with a note of introduction written on the back. Lemler testified that Sangemino requested an additional payment because the handling of this case "was an expensive situation upstairs." (Tr. p. 365). Colonel Nicholson revealed that a compassionate reassignment would not be forthcoming because Lieutenant Petro, a patriot, unbeknownst to Lemler, Sangemino or Petro's parents, had *requested* overseas assignment. Lemler testified that the Petro case was his lone failure, out of the 401 draft and military cases for which he had been retained.

Lemler also testified that he had been retained by Mrs. Leonora Resnick to place her son Edward in medical school and/or to obtain a draft deferment for him.[1] Lemler testified that he had placed Edward Resnick in medical school

---

1. Mrs. Leonora Resnick testified. She admitted she had retained Lemler to place

Edward in medical school, but testified that she did not ask Lemler to do anything

in Barcelona, Spain but that Resnick remained there only one week. Resnick was called for a pre-induction physical examination for which he failed to appear. When Resnick was called a second time, Lemler telephoned Sangemino who told Lemler to come to his office. At a meeting in Sangemino's office, Sangemino gave Lemler his personal business card, with a note written on its reverse side and initialed by defendant, for Resnick to present at the Armed Forces Entrance Examination ["AFEE"] Station to which he was to report for his physical. The note (Government's Exhibit 4) reads:

> "Rm 127
>
> Mr. D'Ambrosi –
>
> Please call me about Resnick
>
> WFS"

Edward Resnick failed his pre-induction physical. According to Lemler's testimony, he paid Sangemino $1,500.00 in connection with Edward Resnick's case.

Lemler testified about his involvement in the case of Richard Falcoff. After consulting with Sangemino, Lemler had Falcoff visit a Dr. Wesolowski to arrange for there to be found some physical defect that would entitle Falcoff to a medical deferment. Lemler testified that, at first, they had discussed seeking a medical deferment because of a polynodal cyst, but later it was decided that the grounds would be epilepsy. Falcoff had previously been examined at an AFEE Station in Louisville, Kentucky and had been disqualified with the recommendation that he be recalled in one month. Falcoff was not recalled because it was subsequently determined that his draft lottery number would not be reached during that calendar year. Although Lemler did not testify further regarding the services he or Sangemino provided in the Falcoff case, Lemler stated that he made two payments to Sangemino in connection with this case totalling $1,500.00.

The Government introduced a tape of a conversation between Lemler and Sangemino recorded on March 20, 1974. The recorded discussion concerns possible explanations to the grand jury of notations in Lemler's records indicating payments to Lemler, and by Lemler to Sangemino. A portion of the transcript of this conversation is set forth below, but the cold words of this transcript cannot convey the desperate quality of this conversation. It must be heard to be understood.[2]

---

in connection with Edward's draft status because she believed at that time Edward would be deferred because he was overweight. The Government introduced a photocopy of a contract between Lemler and Mrs. Resnick which was signed by Lemler, and which Mrs. Resnick testified that she had signed on the original counterpart. (Ex. 1). That contract provided that in consideration for the payment of $10,000.00, Lemler would place Edward Resnick in an accredited medical school in the continental United States. It further provided "that it shall be the responsibility of Dr. Nathan Lemler for Remedial Education, Inc. to successfully handle and process all selective service problems connected with the candidate, for the lifetime of this contract." If Resnick were unable to attend medical school because he had been inducted into the armed forces, regardless of whether or not he had been accepted by a medical school, the contract provided for a full refund.

2. The transcript includes the following:
   Major S: See, see, the thing is, did you, did you tell anybody that you gave me money?
   Lemler: Well, I 'idn't tell them that I gave you money per se.
   Major S: Yeah.
   Lemler: But I marked in my records how much each case cost me.
   Major S: Yeah.
   Lemler: Ah, ah, you know, and if I . . . if I spent ah, $500.00 or $300.00 at Selective Service, this is marked in my record.
   Major S: Yeah, but can't you say that, ah, that you were trying to justify to the people, you were trying to justify to the guy the . . . the work you were doing? That it wasn't payment to Selective Service. You know what I . . . . .
   Lemler: I could say that.
   Major S: (Unintelligible 1 second)
   Lemler: If, if that's, you see, we, to tell a consistent story . . . . .

A fundamental consideration in the presentation of this case was what credibility could be attached to the testimony of Nathan Lemler. Both the Assistant United States Attorney and defense counsel inquired about Lemler's prior convictions, his not infrequent false representations, and his interest in securing the favor of the federal authorities to gain their assistance in avoiding having to serve a lengthy sentence for his state court convictions.

Substantial portions of Lemler's testimony were corroborated by other Government evidence. In addition to the independent evidentiary value of such corroborating testimony and documents, this evidence clearly bolstered the suspect credibility of Lemler as a witness. For example, the Government introduced the business card given to Lemler for use by Edward Resnick at his draft physical. The Government also introduced a record of telephone messages from Lemler's office (Government Exhibits 3, 3A), which tended to corroborate Lemler's testimony regarding Sangemino's activities, and his part in the Resnick case and other cases.[3]

\* \* \* \* \*

Major S: Listen. You see, the thing is, this is that, ah . . . you . . . you charged the guy something for handling the whole thing.

\* \* \* \* \*

Major S: Nat . . . Nat . . . look, Nat, please. The thing is that, ah, you said you know you charged people something. Now you, in other words, you charged them for the medical school and you charged them for your work with Selective Service, how hard you have to work with Selective Service, how many times you have to go back. Not that you gave me money.

Lemler: Yeah, but you see, the idea is this; did you at any time make a deposit in a bank?

Major S: Never.

Lemler: After I saw you?

Major S: Never. There was no one, not even, you know, like, ah, for a cancelling a check. Nothing.

Lemler: In other words, if they, if they find out that I visited you on the 15th of the month or the 17th of the month, any day that's not payday, for you, you didn't, ah . . . make a deposit or put, ah . . . some money in a box or something.

Major S: No. If I did, I could probably explain it. I mean, in, in a bank. Sure, I could possibly explain it.

Lemler: Thank you. Because, you see, I don't know what records of mine they're digging for.

Major S: All right, but the only thing is that you come up and you saw me. Now, the only thing is, I told you that you know you had to go get this paper, you had to go . . . that papers . . . you had to get the other papers.

Lemler: Yes.

Major S: No, what you had to do is, you had to spend traveling and taxis and money and everything else. I mean, you can put down something in the paper to indicate that what you were doing is to, ah . . . for . . . for the work involved, sometime it took you far away.

Lemler: Because you see, I don't want, ah . . . ah . . . to be telling a different story than you're telling.

Major S: Well, you . . . you shouldn't be. Let's tell the truth.

Lemler: Well, the truth is, Bill, that I, ah . . . that I laid out money up here and that I, and, ah . . . I don't want to make a different story.

Major S: You . . . you have . . . look, you have costs.

Lemler: Yes.

Major S: You . . . you come down, ah, ah, like say, for example, you had to get . . . say for example, the guy had a, ah . . . medical letter he needed, ah, you the way you took care of all his problems, you went out, you got the medical records, you got . . . .

Lemler: All right. Now, for example, I went to Doctor Teitelbaum for something like that.

Major S: All right, so you had to lay out money, you had . . . you had to pay the doctor for the letters, you had to, ah . . . or your time involved. Ah, for those things.

3. Excerpts of these messages are illuminating:

"January 26, 1971—Maj. called—'his friends were out today because of the weather.' They did everything they could for Chas. Chas. Shevin called—plans went awry—Dr. L [Lemler] spoke with Maj."
"February 24, 1971—Maj. Sangemino—Call Local Bd #5—IV3-8772—Miss English

The quintessence of all three charges against Major Sangemino was the payment of a bribe. On this fundamental point, Lemler's testimony was supported by the testimony of other witnesses. Charles Mofschowitz, a retired cab driver who had been employed by Lemler as a chauffeur, testified that he had driven Lemler to 26 Federal Plaza, the building in which Sangemino had his office, on six or seven occasions. Mofschowitz also testified that, on two occasions, he delivered envelopes to Sangemino at his office and, on one such occasion, he knew that the envelope contained $300.-00.[4] Harriet Tollin, Lemler's daughter, testified that she had accompanied her father to 26 Federal Plaza on several occasions. Mrs. Tollin recalled that her father remarked on one occasion that "[h]e had to go to the crapper because that was the only place they could have privacy." (Tr. pp. 513–14). Ruth Mear, an employee of Lemler, testified that she accompanied Lemler to Sangemino's office on one occasion but remained outside in a waiting area while Lemler and Sangemino met privately in Sangemino's office. She testified also that, on another occasion, she delivered an envelope to Sangemino on Lemler's instructions but did not know what the envelope contained. Lieutenant Petro testified that he too delivered a sealed envelope from Lemler to Sangemino.

Among the telephone messages from Major Sangemino to Lemler is an entry for June 15, 1971: "Thanks for tickets." Sangemino testified that Lemler had given him airplane tickets and vouchers which could be used on a vacation but that each time he had refused to accept them. Sangemino testified that this entry in the message book was inaccurate in that his actual response had been to express his appreciation to Lemler for the tickets, but that he could not accept them.

The jurors perceived readily the importance of the credibility issue and the independent value of the corroborating evidence. Ten minutes after the jury retired to begin its deliberations, the Court received a request to hear the taped conversation again. One hour later, the jury requested the exhibits relating to Lemler's telephone messages; the testimony of Mofschowitz; and Sangemino's own testimony regarding Lemler's gift of tickets for a vacation in Puerto Rico.

In sum, the Government's case against Major Sangemino was very strong, if the triers of fact viewed Lemler as a credible witness, or considered that they had received substantial evidence to corroborate his relevant testimony.

Challenging the Government's case against Sangemino, defendant's then trial counsel (hereinafter "Counsel") cross-examined Lemler for nearly two and a half days. Counsel reviewed Lemler's prior convictions, prior instances in which he had made false statements, his

---

or Miss Barabash—Close member of family assure that Ed. Resnick will be going to medical sch." (Ex. 3A).

Lemler testified that he called Local Board #5 and informed them that Resnick would be going to medical school; Lemler is not related to Resnick. A recurring issue in the trial was whether, apart from the claim that he accepted money from Lemler, Major Sangemino, as to the registrants, was merely performing his duty as an officer in the Selective Service headquarters in New York City. But see, *United States v. Manton*, 107 F.2d 834 (2d Cir. 1938). The Government attempted to demonstrate that by intervening on behalf of Lemler's clients, Sangemino was not acting within his geographic jurisdiction. Resnick's Local Board #5, referred to by Lemler and mentioned in the telephone message quoted above, was located in Nassau County and was not within the jurisdiction of the New York City headquarters to which defendant was assigned.

4. Four volumes of books maintained by the General Services Administration for security purposes at the doorways to the federal office building at 26 Federal Plaza were introduced as Exhibits 10–13. Although these volumes represent but a segment of the listing of visitors to that building during the period covered by the charges in the indictment, they do prove that Mofschowitz visited the building on June 15, 1971, and that Lemler visited the building on several occasions during this time period.

interest in obtaining assistance to shorten his incarceration on state charges, and pointed up various minor inconsistencies in Lemler's testimony.

Stated briefly, the defendant presented as witnesses: his superior, and fellow employees at New York City's Selective Service headquarters and at the Armed Forces Entrance Examination Stations at Fort Hamilton and Whitehall Street; draft counselors who had sought guidance from the defendant; members of the staffs of a deceased U. S. Senator and several Congressmen who had made inquiries of the Major regarding the Selective Service or military status of constituents; and character witnesses who knew the defendant through his employment or socially.

Major Sangemino testified in his own defense and controverted the testimony of Lemler that he had been engaged in any wrongdoing. Sangemino testified that it was his job to answer Selective Service registrants' inquiries about their eligibility for deferments.

■ We direct our attention to the claims of ineffective assistance of counsel, bearing in mind that "[e]rrorless counsel is not required, and before we may vacate a conviction there must be a 'total failure to present the cause of the accused in any fundamental respect.'" *United States v. Garguilo,* 324 F.2d 795, 796 (2d Cir. 1963). "The current standard of ineffective assistance of counsel in this circuit is that in order to be of constitutional dimensions the representation be so 'wholly inadequate "as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." ' *United States v. Currier,* 405 F.2d 1039, 1043 (2d Cir.), *cert. denied,* 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969)." *United States v. Yanishefsky,* 500 F.2d 1327, 1333 (2d Cir. 1974). "[F]or there to be a lack of compliance with the fundamental fairness essential to due process, counsel's representation must be so ' "horribly inept" as to amount to "a breach of his legal duty faithfully to represent his cli-

ent's interests" . . . .' " *United States ex rel. Scott v. Mancusi,* 429 F.2d 104, 109 (2d Cir. 1970). See also *United States ex rel. Maselli v. Reincke,* 383 F.2d 129, 132 (2d Cir. 1967).

■ Defendant contends that his representation at trial was inadequate because his counsel failed to call certain witnesses. Two witnesses who, it is now argued, should have been called, were the defendant's daughter and son. The defendant's daughter would have testified that, by reason of her employment by an airline, she could have obtained airline tickets for her family at considerably reduced rates; from this, it is to be inferred that the defendant had no reason to accept a gift of airline tickets. On redirect examination, defense counsel asked Sangemino if he had ever asked Lemler for airplane tickets; Sangemino replied that he would not ask for airplane tickets because his wife "is deathly afraid to fly." (Tr. pp. 1014–15). Sangemino was asked about the very subject that his daughter would have testified to, his lack of interest in receiving airline tickets; however, had she testified, two separate rationalizations would have been offered instead of one. This evidence would be at most cumulative and peripheral in its importance. We could not fault counsel for failing to bring out the opportunity of the daughter to obtain airline tickets at less than full price.

The defendant's son would have testified that he had asked his father to assist him on two occasions in obtaining a discharge from military service and that each time his father refused. Defense counsel began to question Sangemino about this on direct examination but, after an objection and a discussion at the side bar, apparently decided, not unreasonably, that this line of inquiry would be counterproductive. (Tr. pp. 934–35).

Defendant also contends that two former commanding officers of the Armed Forces Entrance Examination Station at Fort Hamilton should have

been called to testify about procedures at the Station, and show the difficulty inherent in any attempt to intervene in these procedures. Joseph Winckler, a staff officer at Selective Service headquarters, testified concerning procedures at the AFEE Station. The Colonel then serving as New York City Director of Selective Service, who was defendant's commanding officer, testified regarding AFEE Station procedures; he and a Selective Service liaison officer at Fort Hamilton each testified that Selective Service did not know in advance the names of the doctors who would be on duty for examinations for a particular day.

Likewise, defendant contends that his counsel should have called Lieutenant Colonel Nicholas DeMaria to testify regarding Army procedures in compassionate reassignment cases. But defense counsel questioned Major Robert Keup of the Albany, New York Selective Service headquarters on cross-examination and elicited responses substantially similar to the information contained in the offer of proof regarding Lieutenant Colonel DeMaria.

The persons who it is claimed should have been called as witnesses would not have directly rebutted the Government's case. During the course of the trial, the Court observed that certain areas of inquiry that, it is suggested here, should have been pursued, e. g. Sangemino's son's request for assistance in obtaining a discharge, were of dubious relevance and doubtful admissibility. In many instances, the testimony of these persons would have been cumulative. One person not called would have testified to Sangemino's good reputation among attorneys handling draft cases; several witnesses did testify concerning the defendant's favorable reputation. "When reviewing cases charging incompetence of counsel, . . . [w]e are not conducting a seminar in trial procedures, at least where the tactics involved are those over which conscientious attorneys might differ." *United States v. Gar-*

*guilo, supra,* at 797. "[T]he advisability of calling particular witnesses or the value of extensive cross-examination are matters open to honest differences of opinion . . . . It may well be that another attorney would have resolved these problems differently . . . . Yet this in no way suggests that [the defendant] has been denied a fair trial, or that the errors of counsel were so outrageously incompetent as to shock the conscience of the court." *Id.,* p. 797. "[T]he decision to call or bypass particular witnesses is peculiarly a question of trial strategy . . . which courts will practically never second-guess." *United States ex rel. Walker v. Henderson,* 492 F.2d 1311, 1314 (2d Cir. 1974). See also *United States v. Yanishefsky, supra,* 1332; *United States v. Matalon,* 445 F.2d 1215 (2d Cir.), *cert. denied,* 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 93 (1971).

Defendant next contends that his representation was incompetent because his trial counsel failed to prepare adequately certain defense witnesses. Witnesses D'Ambrosi, Cohen, Spiegelman and Winckler claim, in their affidavits, that they spent little time with defense counsel in preparation for their appearance in court. Spiegelman was prepared by counsel, but Spiegelman and the defendant now complain that counsel decided that it would be an effective trial strategy to have Spiegelman relate bizarre human interest incidents that occurred at the AFEE Stations. But, following accounts of registrants who had sexual fetishes and potential inductees who appeared at the AFEE Station with animals, and cases of mistaken identities, Spiegelman did testify concerning examination procedures and the nature of his communications as a laison officer with Selective Service headquarters.

■ Spiegelman's human interest testimony tended to increase the interest of the jury in his testimony in general, which was favorable to the accused. Spiegelman has testified in many federal criminal cases, usually as a Govern-

ment witness. He is an experienced witness, who projects a genuine aura of integrity. We find no valid basis for criticism in counsel's presentation of Spiegelman's testimony. Often excessive pre-trial preparation and conference with such a truthful and intelligent witness tends to destroy his spontaneity, and has an adverse effect on the credibility and weight to be attached to his testimony. Sometimes it is better if a witness appear unprepared, so long as he appears to be and is truthful. In the case of the experienced witness, Spiegelman, no problem resulted.

■ Although the importance of trial preparation cannot be gainsaid, our concern is with counsel's performance at trial and "our inquiry is limited to 'the character of the resultant proceedings'." *United States ex rel. Crispin v. Mancusi,* 448 F.2d 233, 237 (2d Cir. 1971); *United States v. Wight,* 176 F.2d 376, 379 (2d Cir. 1949). Although the questioning of the defense witnesses in this trial will not stand as a memorable model of trial advocacy, the examination of these witnesses was not so inept as to approach the stringent standard by which we appraise the effectiveness of counsel on a motion for a new trial.

■ It is further asserted that defense counsel failed to qualify certain witnesses as character witnesses with the result that certain reputation testimony was not received. Specifically, defense counsel failed to qualify Mrs. Evelyn Cohen as a character witness under the requirement that the witness must show "such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." *Michelson v. United States,* 335 U. S. 469, 478, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948). See also, Rule 405(a), F.R. Evid.; *United States v. Augello,* 452 F. 2d 1135 (2d Cir. 1971), *cert. denied* 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972). Defense counsel attempted to elicit responses that would qualify Mrs. Cohen as a competent character witness by asking specific as well as general questions that would establish her familiarity with the views of others as to Major Sangemino's good character. The Court believes that Mrs. Cohen answered these questions truthfully. The function of trial preparation is not to metamorphose a witness who is truly incompetent to give the proffered testimony into one who will be able to testify. In any event, it was clear to the jurors that Mrs. Cohen had shown up, along with others, to support the defendant's claim of innocence, and they doubtless thought she was prevented from doing so by the most mere legal technicality.

■ One incident during the trial is cited as the most outrageous sign of ineptitude. Defense counsel attempted to offer the grand jury testimony of Mrs. Leonora Resnick, a witness not yet called, as substantive evidence, before the Government had rested. All that may be said is that the incident occurred at the side bar and that ultimately Mrs. Resnick appeared and testified as a defense witness. No prejudice to the defendant ensued from this blunder, if it was that.[5]

■ Defendant cites as another example of counsel's ineffective performance, his tactical treatment of Lemler's testimony regarding the Richard Falcoff

5. The Court views this incident as some indication of ineptitude to be considered in evaluating the quality of defense counsel's representation. We would not overlook, however, the possibility that what appears now to be ineptitude, was a ploy by which counsel, while the matter was fresh in the jurors' mind, wanted to show the jury that he had something relevant, exculpatory and important which he wanted to bring out concerning Mrs. Resnick. Not every offer of proof, or question or objection is taken on the tactical basis that the attorney doing so believes that the ruling will be in his favor. Furthermore, it is possible that the Court might have erred and permitted this offer, or indeed, that the Government might have failed to object, or consented to the exhibit being offered at the time. In sum, no great emphasis can be placed upon this incident.

case. First, it is claimed that defense counsel did not make a diligent attempt to locate and secure the attendance of Falcoff or his father as defense witnesses. The Court refused to admit the grand jury testimony of Richard Falcoff into evidence because counsel failed to make an adequate showing of unavailability and necessity. The Court observed that such effort which had been made to locate young Falcoff did not show diligence on the part of defense counsel. (Tr. pp. 736–37). Second, it is charged that defense counsel's ineptitude was further demonstrated by his inability to have admitted into evidence Exhibit R, a letter reporting on an electroencephalograph taken on May 11, 1959 when Falcoff was nine years old. It is contended that this document was probative of relevant facts and, that it would have been admissible had a proper foundation been laid, presumably through the testimony of Falcoff or his father, or one of the doctors who had treated Falcoff for epilepsy as a child.

Defendant, by his new counsel, claims that trial counsel's failure to rebut Lemler's testimony regarding the Falcoff case was crucial. It is argued that the defendant could have shown that Lemler was not retained to assist Falcoff in procuring a draft deferment from Selective Service, but rather that Lemler's function was to place Falcoff in law school; that there was no reason for Falcoff to seek Lemler's assistance with a draft problem because he was eligible for a medical deferment arising out of a childhood history of epilepsy; and that this showing would have so damaged Lemler's credibility with the jury as to undercut whatever veracity the jurors would attribute to Lemler's testimony about his involvement with Sangemino in other cases.

Assuming that Falcoff could have been compelled to appear as a witness, and, since he was named as a co-conspirator in this indictment, he did not invoke his privilege against self-incrimination, and assuming further that he testified consistently with his grand jury testimony, it is doubtful that his testimony would have had the claimed effect. Before the grand jury, Falcoff testified that Lemler was to assist him in being admitted to law school but that he did not apply for admission until February 1972 for classes beginning in September of that year. Falcoff also testified that the last telephone contact that he or members of his family had had with Lemler had been in 1971, some time prior to his applications for admission to law school. Falcoff also testified that he had last seen a doctor for treatment of epilepsy in 1959 or 1960 and since 1967, he had taken medication for epilepsy on only two occasions. On cross-examination, Falcoff could have been confronted with inconsistent statements he had made in securing driver's licenses to the effect that he did not suffer from epilepsy (Exhibits 7 and 7A); his answer on Report of Medical History, Standard Form 89, made in connection with his pre-induction physical in Louisville, Kentucky on April 28, 1971 that he did not suffer from epilepsy; and the entry of the physician performing that examination that Falcoff "denies serious illness." (Standard Form 89, Exhibit 6).

Since Falcoff did not appear as a witness, trial counsel was able to argue to the jury in summation (Tr. p. 1089):

"The U.S. Attorney put into evidence the file which indicates that Falcoff was found unacceptable, RBJ, and Major Sangemino told you what RBJ means. It means return believed justified, and that the date given was when the draft board or local Selective Service Board was to refer him back down to the AFEES station for a return examination. However, by the time they got the orders out to him his number in the line had not been reached and he was placed in a holding category known as 1–H. So in fact he was not disqualified or not rejected from service. Certainly if Major Sangemino was going to wave his

wand and do it, it would have been done at that time. What was the sense of bringing him back? It shows you that Falcoff is the normal procedure, he was found not acceptable temporarily, to be returned in December of that year, but by the time they came back in December his draft number for that year's eligibility was over."

We do not infer from this argument that defense counsel abandoned his desire to introduce the grand jury testimony and Exhibit R, and decided on a new tactic. However, it appears that, considering the obvious peril of having Falcoff's testimony impeached, defendant was not prejudiced by the manner in which his counsel proceeded thereafter with respect to Falcoff.

■ Defendant also cites as an example of his trial counsel's incompetence, the failure to submit requests for jury instructions; particularly, that he failed to request an instruction that if a party fails to produce evidence which is under his control and reasonably available to him, then the jury may infer that the evidence is unfavorable to the party who would have produced it and did not. See E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* §§ 12.15, 71.-19. Lemler testified that he gave a card file listing his clients to Harriet Tollin; at trial, Mrs. Tollin denied being given the file. Other records, Lemler claimed, had been taken by the Attorney General of the State of New York. The Assistant United States Attorney stated that neither the State Attorney General nor the Nassau County prosecutor had this file. The Court need not determine retrospectively whether, if requested, the suggested charge would have been appropriate. There were significant grounds on which to base a finding that these records were equally unavailable to the federal authorities, and certainly were not within their control. See *United States v. Brown*, 511 F.2d 920, 925 (2d Cir. 1975); *United States v. Super*, 492 F.2d 319, 321–23 (2d Cir. 1974).

The fact that a request was not made, under the circumstances presented here, hardly shocks the conscience of this Court.

Defendant also finds fault with his trial counsel's failure to move to strike as unresponsive an answer given by Lemler and an answer given by Harriet Tollin. On direct examination, when asked if Lemler said anything to her after meeting with Sangemino, Mrs. Tollin replied that her father had said that he had to go to the men's room to pay Sangemino his money. When asked for the precise words used, Mrs. Tollin did not mention the payment of money but only that they wanted privacy. When defense counsel adopted part of Tollin's unresponsive answer on cross-examination in a question challenging whether she had made the same statement in a prior interview with the Assistant United States Attorney, the question was designed to impeach her testimony on the very point of the payment of money. The risk that using her words would reenforce her response in the minds of the jurors was clearly the risk inherent in the choice of this tactic.

■ Moreover, the use of a motion to strike in a jury trial poses a well-recognized dilemma for a trial lawyer; the harmful answer has already been given, if a motion to strike is granted, will the jury adhere to the Court's admonition to disregard the answer, or will making the objection merely underscore the damaging response and make defense counsel appear to the jurors to be hiding relevant information? The making of a motion to strike is, therefore, a tactical decision to be weighed by counsel on the basis of his sense of the impression that the answer and his objection will have on the jury. R. Keeton, *Trial Tactics and Methods*, § 4.15 (1973). The failure to move to strike the answers complained of in no way impaired the defendant's right to effective representation of counsel.

The Court has examined defendant's other examples of claimed ineptitude, some of which are as insignificant as an unartful choice of phrase.

The Court has also reviewed the entire trial record. Upon careful examination of the record and upon consideration of defendant's specific allegations, the Court finds that the claimed errors, "taken individually and collectively, *United States v. Sanchez* [483 F.2d 1052, 1058 (2d Cir. 1973)] fail to meet the 'stringent standards to be met to show inadequacy of counsel,' *United States v. Maxey,* 498 F.2d 474, 483 (2d Cir. 1974) . . . ." *United States v. Yanishefsky, supra,* 1334.

We observe, as did Chief Judge Kaufman in *United States v. Garguilo, supra,* 797, that "[a] convicted defendant is a dissatisfied client, and the very fact of his conviction will seem to him proof positive of his counsel's incompetence." The impending imposition of sentence and the ability to study a trial record in the quietude of new counsel's offices combine now to provide perfect hindsight.

Defense counsel urges this Court to apply a less stringent standard than found in the decided cases. We are asked to do so in the interests of Justice, and in view of the widespread present concern of jurists and the bar to improve the quality of trial advocacy. The Court has declined to depart from the well-established law of this Circuit. See *United States v. Yanishefsky, supra,* 1333, n. 2. See also, *United States v. Ortega-Alvarez,* 506 F.2d 455, 458 (2d Cir.), *cert. denied* 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975). Since proof of Sangemino's guilt is overwhelming so that Patrick Henry reincarnate could not acquit him, this case is a poor one to blaze new trails.

The Court criticized counsel at the trial, and adheres to all that was said on the record. To present the full picture, however, more must be said. Finesse and guile were entirely absent in defense counsel's approach. This may be a very useful trial tactic in defending an innocent person, involving as it does, an appeal to jurors on commonly perceived terms, based on an apparent longstanding personal friendship and high professional regard for this defendant, and that distaste for Lemler which any decent citizen would share. The Court believes defense counsel failed initially to perceive the weight of the Government's case against his client. Undoubtedly, a point came in the trial when his client's guilt began to dawn on counsel, but by then it was probably too late for a change in tactics.

Defense counsel gave an able summation; the Court said so at the time (Tr. p. 1216). Counsel projected himself to the jurors throughout as an upright and mature lawyer of absolute integrity, and indeed the Court now holds this view with respect to him. He communicated effectively to the jury by words and "Body English". His forthright mien with witnesses, the Court and the jury was excellent. He came through as an individual of integrity entitled to respect on the part of the jurors. His familiarity with armed forces procedure showed the jury that he too had served his country.

Insinuously, he placed his own integrity behind that of the defendant, and conveyed subliminally to the jurors by word and manner his absolute personal belief in Sangemino's innocence. This common tactic among defense attorneys is difficult to pull off successfully, and apparently considered by some to be unethical. Code of Professional Responsibility, Ethical Consideration 7–24 Disciplinary Rule 7–106(C)(4), N.Y. Judiciary Law (McKinney's Supp.1974).[6] Nonetheless, the legendary great advo-

---

6. Ethical Consideration 7–24 reads in relevant part as follows:

"The expression by a lawyer of his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused is not a proper subject for argument to the trier

cates of the bar have always done it, and there is little a trial judge can do to prevent an attorney from endorsing personally his client's protestations of innocence.

Defense counsel also was adept in portraying himself, and his client, as the underdog, faced with the overwhelming power of the federal government, attacked and betrayed by such a worm as Lemler. He attempted, not entirely without success, to place the trial court in a position of appearing to acquiesce in perjury by Lemler and having a shared responsibility for the prosecution of such a fine man as his client. In short, although the representation was not the best, neither was it the worst.

Louis Nizer, a seasoned and successful member of our bar whose own advocate's skills have won him the deserved high regard of the public and his professional colleagues, has written a book, "The Implosion Conspiracy", New York, 1973, as an addition to what he himself describes as "a river of articles, books and plays on the *Rosenberg* case, which has persisted for a quarter of a century."

While making an exhaustive analysis of the trial, and the level of advocacy there demonstrated by the Rosenbergs' devoted and dedicated attorneys, Alexander and Emanuel Bloch *pere et fils,* Mr. Nizer writes:

"An accompanying phenomenon is what I shall call the analytical syndrome. It is possible to take the record of any trial and by minute dissection and post-facto reasoning demonstrate that witnesses for either side made egregious errors or lied. Then by ascribing critical weight to the exposed facts, the conclusion is reached

that the verdict was fraudulently obtained.

\* \* \* \* \* \*

The analytical syndrome can be used to discredit any verdict from the commonest automobile negligence case to the most involved anti-trust or proxy contest.

The fallacy in this approach is that it assumes that all the evidence for the winning side must be believed by the jury, or it would not decide as it did. It ignores the jury's right to be selective of a witness' story and also the reality of conflict of testimony, which the jury must resolve by applying its common sense and keen observation of the witnesses. That is why the law is that not the larger number of witnesses for one of the parties determines the issue. The jury may choose to believe one witness, and often does, against five witnesses who testified to the contrary.

The scales of justice are not laden on one side and empty on the other. If they were, we would not need trials and the complicated rules for measuring veracity. There are weights on both sides and they are not subject to precise evaluation. They must be measured by the values assigned to them in the jury's mind. Jurors often have seven senses, adding horse and common to the usual five.

Nor does it follow that because there is alloy in some of the pieces of gold on one side of the scales that the jury's recognition of its meretricious nature requires it to ignore the decisive tipping of the scales from other weights on the same scale. The opposite scale might be lighter, too, if it

---

of fact. \* \* \* However, a lawyer may argue, on his analysis of the evidence, for any position or conclusion with respect to any of the foregoing matters."

Disciplinary Rule 7–106(C)(4) states that: "In appearing in his professional capacity before a tribunal, a lawyer shall not: Assert his personal opinion as to the justness of a cause, as to the credibility of a

witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein."

were not for some artificial weight." (Quoted from pp. 14–15 of Fawcett edition. All page references to the "Implosion Conspiracy" are to that paperback edition.)

Again, (p. 129) Nizer writes:

"Those who argue for or against the [Rosenberg] verdict do so on the record before them. What is missing is what the record might have been. Jurors must decide on what is put before them. They cannot respond to stimuli which are not there. That is why it is possible for a good case to be lost and a bad one won.

No mystical power places all the facts into the courtroom for the jury to weigh. The theory that heaven would provide the answer permeated trial by ordeal. Where men must do so, the facts must be reconstructed by diligence and research. Cross-examination must excise the truth from a hostile witness' mind. Experts must be engaged to present the defense's side of a scientific postulate. . . .

Does this mean that justice depends partly on the skills of the advocate? Of course. We would prefer it to be an abstract procedure vested with sublime certainty. But justice is administered by human beings and the variations in their abilities affect the outcome as they do in every other enterprise. While acknowledging our regret that justice is not an infallible edict from on high, we can take solace from the fact that no better system of determining controversy has ever been devised."

█ Although our judicial system is concerned justifiably with maintaining the quality of the adversary system of justice and in protecting the right of a criminal defendant to representation by counsel, it is doubtful if a Court should fashion some analogue to the exclusionary rule of evidence. That rule, in criminal cases, punishes society in general, and the prosecutor, in that it allows the guilty to go free because of improper conduct by law enforcement officials in obtaining evidence. See dissenting opinion of Mr. Justice Brennan in *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). So long as the result of the trial does not shock the conscience of the Court or create a farce, no purpose would be served in granting a new trial as a deterrence against incompetent counsel.

A rule premised on deterrence that would award a new trial to a defendant found guilty on the evidence presented to a jury because his counsel's representation was not of the highest calibre simply rewards incompetence. A crafty defense lawyer, confronted with a sturdy prosecution case, would be advised to feign incompetence and seek a retrial at a later date. Clearly, such a result would hardly serve the interests of justice. Granting a motion for a new trial based on the incompetence of counsel is best reserved for situations which truly shock the conscience of the Court and where it might truly be said that the defendant has been deprived of a fair trial.

Incompetence of the bar generally, if it is to be corrected at all, must be done by improved initial education, stiffer admission requirements, and more continuing post-admission legal education. Furthermore, counsel's competency is a function of the case he is trying; most lawyers are perfectly competent to try the general run of criminal cases where the proof is often overwhelming, and the only available trial tactics are to create sympathy, bias against the prosecutor, or some other inducement to juror nullification.

## II

Defendant contends that he is entitled to a new trial because the Assistant United States Attorney failed to turn over copies of the grand jury testimony of Richard Falcoff and Norman Falcoff, his father, until the day before the trial commenced. Defendant contends that, under *Brady v. Maryland, supra,* this de-

layed disclosure necessitates a new trial. We disagree.

■ The Government did disclose the grand jury testimony on the eve of trial. Since the imperative of the *Brady* rule is directed to insuring adequate trial preparation, *United States v. Kahn,* 472 F.2d 272, 287 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973), the Court does not view the fact that disclosure was ultimately made before the trial started as being dispositive of defendant's claim. However, such disclosure is a matter to be considered in determining this branch of defendant's motion.

The tests applicable to a new trial motion were restated in *United States v. Rosner,* 516 F.2d 269, 272 (2d Cir. 1975):

> "[T]he standards governing a motion for a new trial based on evidence available to the government before trial vary according to the government's conduct relative to the information. If the government deliberately suppresses evidence or ignores evidence of such high value that it could not have escaped its attention, 'a new trial is warranted if the evidence is merely material or favorable to the defense.' *United States v. Kahn* [*supra,* 287]. However, when the government's failure to disclose is inadvertent, a new trial is required only if there is 'a significant chance that this added item, developed by skilled counsel as it would have been could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.' *Id.*; *United States v. Miller,* 411 F.2d 825, 832 (2 Cir. 1969); see *United States v. Keogh,* 391 F.2d 138, 147–48 (2 Cir. 1968)."

■ On January 30, 1975 and on February 10, 1975, the Assistant United States Attorney showed the defendant a report of Dr. Piluto, dated May 11, 1959, which states that Richard Falcoff may have an epileptogenic focus in his brain. On the same dates, the defendant was shown Falcoff's Selective Service file containing forms from a pre-induction physical examination conducted in Louisville, Kentucky, one of which bears the notation that Falcoff suffered from petit mal epilepsy and was receiving medication. It is evident that the Government did not deliberately suppress exculpatory evidence relating to the Falcoff case.[7]

Furthermore, it does not appear that the Assistant United States Attorney ignored evidence of such high value that it could not have escaped his attention. Were this true, we would be warranted in applying the less stringent standards followed in cases where sanctions are deemed appropriate. The fact that Falcoff had been treated in childhood for epilepsy, and that this had been noted at his Louisville physical, at which time a recommendation was made that he be recalled in one month's time, were matters of real evidentiary value, and they were disclosed. As has been previously noted, the Falcoff grand jury testimony, replete with inconsistencies concerning his medical history and the nature of his involvement with Lemler, was of dubious evidentiary value, which a prosecutor might readily have bypassed in discharging the duties imposed by the *Brady* rule. See *United States v. Rosner, supra,* 272.

■ We, therefore, apply the test, set out in *United States v. Miller, supra,* whether there is a significant chance that more timely disclosure would have permitted skilled counsel to develop this information in such manner as to have induced reasonable doubt in the minds of the jurors. See *United States v. Seijo,* 514 F.2d 1357 (2d Cir. 1975) and cases cited at n. 9 therein.

In the bill of particulars, the Government identified Falcoff as a client of

---

7. Defendant's trial counsel acknowledged, in a side bar conference concerning the admissibility of the 1959 report of Dr. Piluto, that "Harris [the prosecutor] has been most forthright in his information given to me." (Tr. p. 898).

Lemler whose case might become an issue at trial. Thereafter, Selective Service and medical materials relating to the Falcoff case were made available to and were studied by the defendant. Thus, the crucial underlying facts were disclosed well in advance of trial.

Although clearly not statements governed by 18 U.S.C. § 3500, the grand jury testimony was provided in time to yield information for use in the cross-examination of Lemler. We have noted (*supra*, p. 21) the tactical difficulties that might have been encountered had Falcoff been located and subpoenaed to testify here. Even assuming that Lemler's credibility could have been damaged further in a contest of oaths with Falcoff, who, it should be noted would also have been an interested witness of suspect veracity, there remained the inculpatory testimony of Mofschowitz, the recorded conversation between Lemler and Sangemino and considerable circumstantial evidence which Falcoff's testimony could not have overcome. See *United States v. Rosner, supra. Cf. United States v. Seijo, supra.*

There is no basis for inferring that had more prompt disclosure been made, skilled defense counsel might have utilized the additional knowledge to be gleaned from study of the grand jury testimony in preparation for trial, and thereby induced a reasonable doubt in the minds of the jury, avoiding conviction. The Government disclosed the material facts pertaining to the Falcoff case. Disclosure of the grand jury testimony itself earlier would not have been a significant addition to the defense arsenal. *Cf. Grant v. Alldredge,* 498 F.2d 376 (2d Cir. 1974).

Defendant also argues that his trial counsel was incompetent in that he failed to request *Brady* material. At a pre-trial conference, defense counsel requested court-ordered disclosure of all grand jury materials and this request was denied. The Court attributes no significance, under the circumstances presented here, to the fact that a specif-

ic request for *Brady* material was not made. Throughout the pre-trial stage, the Government acknowledged expressly, its *Brady* obligations. The identification of *Brady* material and its disclosure remain the responsibility of the prosecutor. There is no basis for inferring that, had a more specific request been made, more prompt disclosure would have been achieved since the identification of *Brady* material is preliminarily a matter for the prosecutor's judgment.

Defendant's motion for a new trial, pursuant to Rule 33, F.R.Crim.P., is in all respects denied.

So ordered.