**UNITED STATES of America,**
Appellee,

v.

**Jack MATALON, Appellant.**

**No. 944, Docket 71–1067.**

United States Court of Appeals,
Second Circuit.

Argued May 14, 1971.

Decided June 16, 1971.

Certiorari Denied Oct. 12, 1971.
See 92 S.Ct. 92.

Jerome Lewis and H. Elliot Wales, New York City, for defendant-appellant.

Walter S. Rowland, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for Southern Dist. of New York and Peter F. Rient, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, Chief Judge, WATERMAN, Senior Circuit Judge, and ZAVATT,* Senior District Judge.

ZAVATT, District Judge:

Appellant Matalon appeals from a judgment of conviction following a jury trial before Judge Mansfield in the Southern District of New York. The three count indictment charged appellant and three others (Rosenberg, Betesh and Daskal) with having induced one Norman Allan to travel in interstate commerce on March 14, 1963 (Count 1) and April 18, 1963 (Count 2), for the purpose of executing a scheme to defraud him, in violation of 18 U.S.C. §§ 2314 and 2 and with conspiring to violate the said statute (Count 3), 18 U.S.C. § 371.

Rosenberg died prior to the trial. Daskal pleaded guilty to Count Three and testified for the Government. Betesh and appellant proceeded to trial, which commenced on December 4, 1970 and terminated on December 10, 1970. Betesh was found guilty on the first and third counts but was acquitted on the second; appellant was found guilty on the second and third counts but was acquitted on the first. On January 20, 1971, Judge Mansfield sentenced appellant to concurrent one-year terms of im-

---

* Of the Eastern District of New York, sitting by designation.

prisonment on Counts Two and Three, which he has yet to serve, having been enlarged on bail pending the outcome of this appeal.

Appellant's only ground that concerns us on this appeal is his claim that he was denied the effective assistance of counsel at trial. This serious, but not uncommon allegation, is premised on trial counsel's calling of seven reputation witnesses, all of whom were impeached on cross-examination with evidence of defendant's prior criminal history. It is clear that the prosecution would have been unable to introduce this evidence if the reputation witnesses had not been called. See Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). In effect, the defendant claims that his conviction resulted from this blunder of defense counsel, compounded by his calling the defendant to the stand; that these errors enabled the jury to convict him, not on the evidence in this case, but, rather, because he was a man of criminal character. See United States v. Bozza, 365 F.2d 206, 213 (2d Cir. 1966).

The appellant did not include in his appendix any of the evidence adduced by the Government on its direct case or any of the cross-examination of the Government's witnesses. The appellee submitted no appendix. Nevertheless, the court has studied the entire trial transcript.

Norman Allan, the victim and a Government witness, testified that he was in the business of importing, exporting and distributing merchandise in Detroit, Michigan. On March 8, 1963, he and Rosenberg met in Detroit and Rosenberg offered Allan 8,500 six-transistor radios for sale at $2.75 each. Allan accepted this offer and obtained a letter of credit for $23,375.00 from his bank in Detroit (7).[1] Thereafter, and on March 14, 1963, he traveled to New York City but did not talk business with Rosenberg until the next day, when Rosenberg informed him that only 6,300 radios would

be available and that the cost would be $3.43 per unit (9). Following some bickering over the financial details and quantity of the purchase, Allan agreed to buy 6,300 six-transistor radios and 10,000 two-transistor radios for approximately $26,000.00, which he paid over to Rosenberg in the form of two cashier's checks and received from Rosenberg an invoice from Charles I. Betesh Company for the radios (18–20). Prior to returning to Detroit on March 18th, Allan made arrangements to have the radios shipped to Detroit. On March 17th, Allan returned to New York in connection with this transaction, accompanied by a lawyer, Arnold Gordon (27). They proceeded to the offices of Bayer, Pretzfelder & Mills (B, P & M) in New York City, where he met Rosenberg, Daskal and Matalon, the latter two for the first time (28). This company was owned by Daskal and Matalon. Allan returned to Detroit once again. Gordon remained in New York where he received the runaround because Rosenberg, according to Daskal, had other plans for the radios which he had previously sold to Allan. On March 14th, Brechner Bros. received an order from Charles I. Betesh and Company for 6,300 radios (202). The delivery papers, enabling the bearer to remove the radios from the Brechner warehouse, were turned over to the defendant Ralph Betesh (207). On March 18th, Rosenberg signed a bill of lading, purportedly in an agency capacity for Allan (208).

On March 19, 1963, while Allan was in Detroit awaiting the delivery of the radios which he had already paid for, Rosenberg, the apparent mastermind of the scheme, came to the offices of B, P & M where he met Daskal and Matalon. He requested Daskal to rent a Hertz truck, which he did. Because Daskal was unable to drive a stick-shift, Matalon drove the truck to the warehouse, accompanied by Daskal and Rosenberg (237–239). En route, Rosenberg tried to sell the

---

1. Numbers in parentheses, except where otherwise indicated, refer to pages of the trial transcript.

radios he was about to pick up, to Daskal, who initially agreed, but backed off when he ascertained from the bill of lading that they belonged to Allan. Although Matalon heard this conversation he, nevertheless, attempted to convince Daskal to buy the radios (241). After picking up the radios, Rosenberg sold them to others, and the next day, March 20, 1963, returned to Daskal's office and gave Daskal and Matalon $2,000.00 or $2,500.00, "since we helped him with radios" (243). Daskal and Matalon then divided their share of the proceeds of the illicit transaction.

There followed a series of phone calls and visits from Allan, who, understandably, was interested in obtaining his prepaid merchandise. Rosenberg had told Matalon and Daskal, who by now must have known what had transpired, that, since they had shared in the proceeds, they should help to keep Allan calm (245). On March 25, 1963, in response to a call from Allan, Matalon told him that he did not know where the radios were (30). On April 11, 1963 Matalon told him that a "gypsy truck" had picked up the radios in Chicago (where Rosenberg had told Allan they were) and was bringing them to a warehouse in New York (38). Finally, on April 18, 1963, while Allan was again in New York, Matalon allegedly spoke to a Mr. Harvey, who was supposed to be packing Allan's radios at a warehouse and requested him to "hurry up faster" (41). The radios were never delivered to Allan nor was his money ever returned.

In addition to this fraud, evidence was introduced to show that on March 17, 1963 Matalon defrauded the same Allan out of $30,000.00 for pearls which were never received (46–52). The details of this transaction were corroborated by Daskal (250–257).

The Government's case against the defendant Matalon was strong. There was ample evidence from which the jury could find that, as of March 20th (the date appellant received the proceeds of the fraud), Matalon had joined the conspiracy to defraud Allan (Count 3), and that his several efforts to stall Allan after that date were, in part, responsible for Allan's trip to New York on April 18, 1963 (Count 2). The Government's case consisted not only of the testimony of the victim but also the corroborative testimony of the co-conspirator Daskal, and all the relevant documents. Counsel for Matalon had cross-examined both Allan and Daskal extensively, and, obviously, thought this insufficient. This was a case in which "there [was] not too much the best defense attorney [could] do," United States v. Katz, 425 F.2d 928, 930 (2d Cir. 1970). Counsel apparently had no witnesses to call other than the defendant, who had a criminal record; so he chose to call reputation witnesses.

It is apparent, from a reading of the trial transcript, that the defendant's counsel wanted to bring to the attention of the jury the fact that the defendant was an active member of the Broome & Allen Boys Association, a charitable organization which conducts periodic fund raising activities in order to send young, underprivileged children to camp. He called seven persons, six of whom appear to be substantial businessmen, and one, a rabbi, who was a cousin of the late Supreme Court Justice Benjamin Cardozo, in order to elicit this information. Several of these witnesses were active members of the Broome & Allen Boys Association; one was its President and one was Co-Chairman of that Association's camp fund. Two of the witnesses were members of the same Masonic lodge as the defendant. One was a fellow member of the same Jewish temple, Temple Torah Israel. Rabbi Cardozo testified to the defendant's activity as a founder and active member of the Sephardic Center of Forest Hills, Long Island, New York. All seven of these witnesses were substantial citizens and their testimony as to the defendant's reputation for honesty, etc., could have been very persuasive.

Each witness, on cross-examination, was asked whether he knew that the defendant had been arrested for grand larceny in 1945 (25 years before the date

of the trial); whether he knew that the defendant had been convicted of auto theft in 1947 (23 years before the date of the trial); whether he knew that the defendant had been court-martialed and convicted in 1946 (24 years before the date of the trial) for what the prosecution called "black market activities"; whether they knew of two pending indictments—one for possession of goods stolen while moving in interstate commerce and the other for smuggling jewelry.

After this cross-examination of the seven reputation witnesses, defendant's counsel decided to call the defendant to the stand in an apparent attempt to mitigate the adverse effect of the defendant's apparently horrendous criminal record.

Through the testimony of the defendant, he elicited the fact that, at age 17, the defendant and other youngsters took an automobile for a ride in 1945; that the defendant was arrested for grand larceny but the charge was dismissed. He also brought to the attention of the jury that, in 1947 at age 19, the defendant (while in Florida upon his discharge from the United States Army Air Force) borrowed a car from a friend, who represented himself to be the owner; drove it from Miami Beach to Miami; was charged and convicted for joy riding and paid a $55.00 fine. The alleged "black market activities" in 1946 involved a common practice by military personnel to bring into a military reservation for persons stationed there, hard liquor, in violation of military regulations—more honored in the breach, as anyone who has served in the Armed Forces well knows. It was developed that this crime was committed by all the military personnel aboard an airplane on its return flight from somewhere in the Pacific to the Air Force base in Okinawa, which the defendant described as a "bleak island." For this horrendous crime, the defendant was reduced in rank from Corporal to Private, fined $50.00 and confined to the base for thirty days. But the confinement was countermanded after three days. As to the pending indictments, the defendant claimed his innocence and testified to exonerating facts and circumstances. Every jury, including the jury in the instant case, is advised by the court that an indictment is merely an accusation; that it is no evidence whatsoever of a defendant's guilt and that no inference may be drawn from the fact that the defendant has been so indicted. It is arguable that the defendant's testimony tended to mitigate rather than exacerbate the effect of the cross-examination of the reputation witnesses.

### Ineffective Assistance of Counsel

■ It has long been the law in this Circuit that the defendant must meet stringent standards in order to prevail on such a claim. "A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice," United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S. Ct. 478, 94 L.Ed. 586 (1950). This test has been adhered to in subsequent decisions of this court, United States v. Currier, 405 F.2d 1039, 1043 (2d Cir.), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969); United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967); United States ex rel. Boucher v. Reincke, 341 F.2d 977, 982 (2d Cir. 1965); United States v. Garguilo, 324 F.2d 795, 796 (2d Cir. 1963). "If counsel's representation is so 'horribly inept' as to amount to a 'breach of his legal duty faithfully to represent his client's interests,' Kennedy v. United States, 259 F.2d 883, 886 (5th Cir. 1958), cert. denied 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982 (1959), there has been a lack of compliance with the fundamental fairness essential to due process." Reincke, supra, 383 F.2d at 132. "Errorless counsel is not required," Garguilo, supra, 324 F.2d at 796, and "tactical errors or mistakes in strategy," Id. at 797, even if established, will not suffice to meet the high burden placed on

the defendant. See also United States ex rel. Sabella v. Follette, 316 F.Supp. 452 (S.D.N.Y. 1970); United States ex rel. Pugach v. Mancusi, 310 F.Supp. 691, 716 (S.D.N.Y. 1970), aff'd, 441 F.2d 1073 (2d Cir. 1971).

Defendant argues that trial counsel's calling of the seven reputation witnesses and their subsequent impeachment and then calling the defendant, places this case out of the "strategic" category, and by inference, into the realm of "horribly inept," thus requiring reversal. He argues that the jury, which otherwise would never have heard evidence of defendant's criminal history, heard it not once but seven times. In considering the advisability of counsel's action, the court bears in mind the incisive dictum of Judge Friendly in his recent opinion of United States v. Katz, 425 F.2d 928 (2d Cir. 1970):

> Determination of the effectiveness of counsel cannot be divorced from the factual situation with which he is confronted. When, as here, the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do. If he simply puts the prosecution to its proof and argues its burden to convince the jury beyond a reasonable doubt, the defendant may think him lacking in aggressiveness, and surely will if conviction occurs. If he decides to flail around and raise a considerable amount of dust, with the inevitable risk that some may settle on his client, the defendant will blame him if the tactic fails, although in the rare event of success the client will rank him with leaders of the bar who have used such methods in some celebrated trials of the past. 425 F.2d at 930.

Appellant claims that trial counsel was unaware that these reputation witnesses could be impeached with evidence of defendant's criminal history. Even if he were so unaware, he surely knew it after the first such witness had been cross-examined. The calling of six other reputation witnesses, who were similarly impeached, must be considered a strategic decision because it was made with knowledge of the consequences, and one made in a case where something *had* to be done, but in which there was little that could be done. The calling of defendant to the stand to explain his prior record was clearly a strategic decision.

■ Whether these decisions were particularly wise or whether another trial lawyer would or would not have employed the same tactics is irrelevant. As this court has noted, " * * * the advisability of calling particular witnesses * * * [is a] matter[s] open to honest differences of opinion—especially where, as here, the evidence to be elicited would not have directly rebutted the strong case against the appellant." *Garguilo, supra,* 324 F.2d at 797. While the court may question the wisdom of calling reputation witnesses or the defendant in this case, the tactics so employed by defendant's trial counsel do not "shock the conscience of the Court" and did not make the trial "a farce and a mockery of justice." *Wight, supra.*

In response to appellant's claim that, due to counsel's incompetence, he was convicted because he was a man of criminal character and not on the Government's evidence in the case, the court notes that, despite the egregious blunders claimed to have been committed by trial counsel in defense of his client, the appellant was acquitted on Count One of the indictment, cf. *Katz, supra,* 425 F.2d 931. This count concerned the inducing of Allan by the four defendants to come to New York on March 14th for the purpose of defrauding him. The evidence adduced at trial indicated that Matalon did not appear on the scene until March 17, 1963, when Allan met him for the first time. Thus, far from being dissuaded from considering the direct evidence, the jury obviously paid attention to it, as indicated by its acquittal of him on this count, a verdict in accord with the evidence.

The defendant's other claims on appeal (lack of a speedy trial and evidence of a contemporaneous similar act) are lacking in merit. The judgment of conviction entered below is affirmed.