UNITED STATES ex rel. Nancy ROSNER, on behalf of Thomas LiPuma, Petitioner,

v.

COMMISSIONER, NEW YORK STATE DEPARTMENT OF CORRECTION, and Warden, New York State Correctional Facility, Ossining, New York, Respondents.

No. 75 Civ. 3175 (WCC).

United States District Court,
S. D. New York.

Sept. 24, 1976.

Supplemental Memorandum and Order Oct. 19, 1976.

Nancy Rosner, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. N. Y., New York City, for respondents; Rhonda Amkraut Bayer, Asst. Atty. Gen., of counsel.

## MEMORANDUM AND ORDER

CONNER, District Judge:

Petitioner Thomas LiPuma, currently serving a five-year-maximum term of imprisonment pursuant to a judgment rendered in Supreme Court, New York County, on June 24, 1974, was convicted of second degree burglary and petit larceny after trial to a jury. Having unsuccessfully appealed that judgment to the New York Appel-

late Division and Court of Appeals, petitioner now collaterally challenges his conviction under 28 U.S.C. § 2254.

Petitioner has launched a three-pronged assault against the state judgment, claiming that (1) he was so inadequately represented by retained defense counsel that he was denied protections rightfully his under the Sixth and Fourteenth Amendments; (2) the trial court's refusal to declare a mistrial, despite the admission of inculpatory evidence relevant solely to indictment counts that were ultimately dismissed, constituted a denial of petitioner's due process rights; (3) the prosecutor's summation was so inflammatory and otherwise improper that it effectively vitiated the Constitution's fair trial guarantees.

Reference to petitioner's appellate submissions discloses that the state courts have had a fair opportunity to pass upon the three contentions advanced by petitioner herein. This Court is thus satisfied that petitioner has exhausted his state remedies in accordance with 28 U.S.C. § 2254(b) and (c).[1] *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Ralls v. Manson*, 503 F.2d 491, 493 (2d Cir. 1974). See *United States ex rel. Gibbs v. Zelker*, 496 F.2d 991, 993–94 (2d Cir. 1974); *United States ex rel. Nelson v. Zelker*, 465 F.2d 1121, 1123–25 (2d Cir.), *cert. denied*, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497 (1972). The merits of petitioner's present claims may best be measured against the historical background—partially reflected in the state court trial transcript and supplemented via an evidentiary hearing held by this Court—traced in relevant portions as follows.

## I.

On the evening of January 10, 1972, Mr. and Mrs. William Robinson, returning to their suite in the Berkshire Hotel, discovered that various items—including a leopard-skin coat and a mink jacket—had been taken from their rooms during their absence. Minutes before, Mr. and Mrs. Raymond Geibel, the elderly occupants of rooms on the floor above, had returned to their own suite from an evening's stroll only to encounter a situation no less disconcerting: an intruder—entirely unknown to them—sitting at the desk in their front room. Asked by Mrs. Geibel to explain his presence, the stranger announced that he was a hotel security officer investigating several reported burglaries at the Berkshire. Thereupon, two additional men appeared from the Geibels' bedroom and hurriedly corroborated the explanation proffered by the first. Mr. Geibel, then recuperating from recent brain surgery, summoned enough wit to demand from the three credentials of their purported capacity. Hastily assuring Mr. Geibel that they would return with the proof demanded, the three strangers just as hastily exited from the couple's suite. In the hope of drawing from the men some further information or reassurance, Mr. Geibel accompanied the three down the hall and remained with them until arrival of the elevator. Thereafter, taking stock of their rooms and their property, the Geibels unhappily noted the presence of a state of disarray and the absence of a small pill box, approximately five dollars in value, from a bedroom dressing table.

The incidents described above were quickly reported by the victims. Within minutes of those reports, the police had arrived at the Berkshire, had sealed the hotel's front doors, and had interviewed the Robinsons and the Geibels. From the former, the police obtained a list of the items that had presumably been stolen; from the latter, the police elicited a description of

---

1. Respondent's suggestion that petitioner's third and second claims have not been submitted to the state courts in their present constitutional posture is not confirmed by reference to petitioner's brief on appeal. Although the Sixth and Fourteenth Amendments are not mentioned in terms therein, the substance of both claims respecting the essential fairness of the state court trial was clearly placed before the state courts on appeal.

three suspects, two reportedly "latin types," the third of "lighter skin." After a general search of the hotel's hallways and stair-wells, the police consulted the Berkshire records. The register disclosed that Suites 612 and 613 were occupied by new regis-trants. Three police officers were assigned to investigate those suites. What the offi-cers discovered in Suite 613 is largely a matter of no dispute. The manner in which that discovery was accomplished, however, is a question that lies at the heart of the present petition.

## II.

One James Doyle, under an assumed name, had checked into the Berkshire, and was assigned Suite 613, sometime during the early evening of January 10, 1972. And it was Doyle whom the police first encoun-tered at the threshold of the suite later that evening. The officers encountered petition-er as well in Suite 613, but rather more indirectly: at the time of discovery, peti-tioner was crouched inside a bedroom closet, joined in that posture by one Peter Raimon-do. Also found inside the suite were a leopard-skin coat, a mink jacket, and a small pill box, the last harbored in one of Raimondo's pockets.

Petitioner and his two companions were placed under arrest and brought to the local precinct stationhouse. Within two hours of the hotel burglaries, the three were sepa-rately placed in line-ups and viewed by the Geibels. Mr. Geibel was unable to identify any of the three. Mrs. Geibel identified petitioner alone as having been among the three strangers whom she had confronted earlier in the evening. At LiPuma's trial some two-and-one-half years later, Mrs. Geibel would testify that petitioner had been the man at the desk whom she had initially encountered upon her return to her Berkshire suite on January 10, 1972.

## III.

On March 7, 1972, LiPuma, Doyle and Raimondo were arraigned on an indictment that charged each with two counts of second degree burglary, petit and grand larcenies, and two counts of criminal posses-sion of stolen property. At the time of arraignment, petitioner was nominally rep-resented by Lawrence Hochheiser, Esq., re-tained counsel for Doyle. Two months thereafter, petitioner retained Michael Coi-ro, Esq., as his individual counsel, an en-gagement reflected in a formal substitution for Hochheiser recorded on May 14 or 16, 1972. Coiro and his partner, Salvatore Quagliata, Esq., were to represent LiPuma as co-counsel via a division of labors, the former to act as courtroom counsel, the latter to attend to paper submissions on motion practice in the case.

During independent consultations with their respective attorneys, both Doyle and LiPuma maintained that the police had en-tered Suite 613 of the Berkshire without the lawful occupants' consent. Each re-counted that, prior to the policemen's entry, he had heard a commotion in the outside hall and the sound of a neighboring door being broken down. Each recalled a knock at the door of Suite 613, the policemen's announcement of their presence, and LiPu-ma's flight, with Raimondo, to the bedroom closet. Doyle, according to Hochheiser's la-ter account, "spoke of master keys being used and policemen forcing their way in with guns." Both Doyle and LiPuma re-called that the Robinson furs had been dis-covered by the police only after a search of the suite.

On April 5, 1972, i. e., before LiPuma's individual counsel had been retained, Hoch-heiser had filed on Doyle's behalf a motion to suppress all evidence derived from the search and seizure of January 10, 1972. On May 16, 1972, Quagliata, appearing on Li-Puma's behalf before Supreme Court Jus-tice Leff, took part in the following collo-quy:

"Mr. Quagliata: The defendant came to [my] office last night. We went through the facts briefly. * * *. Now, from the little information that we have, with-

out getting a copy of all the papers, it would appear that there are some motions that lie. In order to expedite the matter, I would ask the Court for an adjournment sufficiently long enough so that I could collect all the information, get whatever witnesses are necessary should there be any witnesses and file any motion papers. * * *. I would file motion papers as soon as it is practicable, as soon as I can find if a motion lies."

"The Court: We have adjourned this case to May 30th [1972], and if you have to make any motions, make them in ample time so that the papers will be back here before then."

After fuller discussion with their client, and a pooling of information with Hochheiser, co-counsel for LiPuma jointly concluded—as had Hochheiser—that the facts, at least according to their client, supplied the stuff of which a meritorious suppression motion is made: the events preceding the police entry of Suite 613 did not, after all, bespeak the probable cause and exigency of circumstances that would otherwise have justified a warrantless search without consent. In July or August 1972, LiPuma was advised by Coiro and Quagliata that a motion to suppress had been filed on his behalf.

At some time between the summer of 1972 and the spring of 1973, a private investigator was hired at the joint expense of LiPuma and his co-defendants. The investigator reported to counsel the results of his interview with a hotel clerk employed at the Berkshire during the time of the occurrences in question: the clerk disclosed that the door adjacent to Suite 613 had been damaged on the evening of January 10, 1972, and that, at some point during that evening, he had supplied the police with a master key.

## IV.

On May 3, 1973, James Doyle pleaded guilty to one count of second degree burglary. Doyle's counsel had advised the plea in the light of a federal indictment that had been pending against his client. Hochheiser later explained:

"[Doyle's] public defender [on the federal charge] had negotiated a plea for that case * * * and arranged for an 8-year sentence in that case.

I had discussed that situation with Judge George Roberts, who was an acting Supreme Court Judge in the State of New York at that time, and Judge Roberts had told me that if Doyle got substantial time in the federal [case], and not merely nominal time, that he would accept a plea of guilty under which he would sentence Doyle to concurrent time which * * * would satisfy me that Doyle wouldn't wind up doing a million years.

* * * [S]ince my understanding at that time was that Doyle would in effect do this time at the same time he would do the federal time and would do it in a federal institution, which was better time than a state institution, it is more civilized and easier to do, that it seemed to me that there was no purpose in pursuing this case any more."

Hochheiser described as well what he characterized as a "secondary" consideration in his client's decision to plead guilty. At some point prior to May 3, 1973, Hochheiser had interviewed one or more of the police officers who had participated in the January 20, 1972 search and seizure in Suite 613. According to the account given by the officer or officers, James Doyle—in an attempted bluff—had permitted the policemen access to his rooms and, indeed, had invited them to "come in and look around"; once inside the suite, the officers had spied, in plain view atop a bed, an open suitcase from which overflowed a mink jacket and a leopard-skin coat. Again according to the recital by the policeman or policemen, Doyle's furtive glances toward the bedroom

closet quickly led the police to their discovery of LiPuma and Raimondo.

Hochheiser later recalled his reaction to the above-outlined interview:

"After they told me what in effect they would be testifying to, I realized that, A, if their testimony was true and believed that they would probably win; or, B, if their testimony was false that they were pretty clever policemen and knew the law well enough to lie effectively enough to beat Doyle, who had an extensive criminal record."

To these last observations, however, Hochheiser added:

"[W]ithout the Connecticut situation I would not have come to [the] conclusion [that the suppression motion was ill-fated]. Without the Connecticut situation I would have said that this may be tough but I am going to do it * * *. [I]f I didn't have the Connecticut case to use as an umbrella, so to speak, I would have proceeded."

Conceding that "there is some benefit to taking a motion to suppress and then taking a plea," Hochheiser explained why he had not taken that course:

"[T]he practical answer is prosecutors don't let you do it. If you want the plea, you give up the motion generally. It is not universal but generally. I can tell you that this particular prosecutor who took over the case, Mr. Kreidman, was not the most liberal Assistant District Attorney in that office, and I can tell you most certainly that there was no possibility of having that motion heard and then getting the plea that I thought I worked out."

While the state indictment was still pending against Doyle, Hochheiser briefed Quagliata on the substance of the statement(s) elicited from the police officer(s). Quagliata, like Hochheiser, realized that "there would be a problem in proving the motion to suppress." Nevertheless, armed with the defendants' version of the events in Suite 613, a version reinforced in some of its aspects by the statement of the Berkshire Hotel clerk, Quagliata was determined to press the motion on LiPuma's behalf. After all, a suppression motion was, in Quagliata's view, crucial to LiPuma's defense: it would constitute a challenge to evidence upon which no fewer than three of the six indictment counts were predicated and upon which the remaining counts in substantial part rested.

## V.

Thomas LiPuma was brought to trial on May 2, 1974. On the preceding day, a *Wade-Stovall* hearing had been held on defendant's challenge to Mrs. Geibel's January 10, 1972 line-up identification of LiPuma. Justice Fraiman, the judge presiding both at the pre-trial motion hearing and the trial to follow, ruled the out-of-court identification admissible. At trial, the prosecution witnesses included, *inter alia,* Mrs. Geibel and Officers Donnelly, Powers, and Green, the policemen who had searched Suite 613 and seized LiPuma, his two companions, and the items allegedly stolen from the Robinsons and the Geibels.

On the witness stand, Mrs. Geibel recounted her verbal exchange with the "man sitting at the desk," whom she identified in court as the defendant. In testifying with respect to the events immediately thereafter, Mrs. Geibel recalled that, after her momentary exchange with the first stranger, "I wasn't watching anybody. I was watching the whole scene, I guess." In retracing the details of her line-up identification of LiPuma, Mrs. Geibel conceded that she had recognized one or more police officers among the five men placed in line with LiPuma.

Officer Donnelly was the first of the three policemen involved in the search and seizure to be called to the stand. Donnelly rehearsed the events of January 20, 1972, from his assignment to investigate the two sixth-floor suites, through the search and seizure that followed, to the ultimate stationhouse proceedings.

The next witness, Officer Powers, described in some detail the circumstances of his entry, with Officers Donnelly and

Green, into the suite occupied by LiPuma and his companions on the evening in question. The following reproduces a portion of Powers' testimony on direct examination:

"Q. Tell us what happened when you got to room 613, sir.

A. Patrolman Donnelly knocked on the door. A voice answered, 'Yes.'

Patrolman Donnelly said, 'We're New York City police. We'd like to speak to you.'

And there was a silence, and then, 'What's it all about?' I think were some of the words used, and one of us mentioned that we wanted to make sure that you were all right, there had been trouble in the building and we would like to make sure that you were all right.

After a brief moment, the door opened, a man stood there in boxer shorts. Patrolman Donnelly engaged him in a conversation.

I went past the man. I went to the end of the room which [sic] the window was open. There were drapes. I looked behind the left drape."

The cross-examination of Powers elicited the following testimony:

"Q. [Y]our testimony was, correct me if I am wrong, sir, that 'I walked past him into the apartment to the open window.'?

A. That's right.

Q. In other words, you just pushed your way into that apartment?

A. No, I'm sorry, I didn't push my way in.

Q. Not that you physically pushed somebody, but the door was open and you stepped right through the apartment—right through the doorway into the apartment?

A. That's correct."

Recross-examination of Powers was punctuated by the following questions from the

Court and the following responses by the witness:

"THE COURT: Excuse me. Exactly what transpired when, as he opened the door, did he say something to you when he opened the door, or did you way something to him as soon as he opened the door?

THE WITNESS: When he opened the door, I can't recall the exact words.

THE COURT: In substance.

THE WITNESS: Patrolman Donnelly engaged in conversation. It went something like, 'Are you all right, mister? Anybody in here that's not supposed to be?' Or something to that effect. We had been looking for people in the building that had committed a crime.

THE COURT: What did he say in response to your—Patrolman Donnelly?

THE WITNESS: He said something that he was sleeping.

THE COURT: And what did you do during this time?

THE WITNESS: I went right past the two of them." [2]

### VI.

Sometime during the morning of the second day of trial, defense counsel Coiro, addressing Justice Fraiman apparently off the record, had broached the subject of a motion to suppress; Coiro had subsequently interrupted his cross-examination of Officer Donnelly to supply the judge with a case citation in support of defendant's standing to make such a motion. That afternoon, when the testimony of Officer Powers was completed, Coiro and the Court engaged in the following colloquy:

"MR. COIRO: Might I take the liberty of asking Your Honor as to my request for a motion to suppress?

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: If it isn't on formal papers, I certainly want a little more than your saying "motion to suppress" and saying "Jones against the United

---

**2.** Officer Green, whose testimony followed that of Powers, related a significantly different version of the officers' entry into, and search of, Suite 613. Thus, according to Green, Doyle had invited the three policeman to search the suite "for security purposes."

States" and then expecting me to rule on your motion.

MR. COIRO: Judge, I think I might be able to clear that up on Monday. I'll have my associate here because he tells me, Judge, and I don't want to say anything to the Court that isn't exactly so, that one of his appearances, I think before Judge Leff, I think it is, Your Honor, I'm not sure of the name, when [Assistant District Attorney] Andrews was handling the case that, at that time, on the record, that they consented to—the People consented to a motion to suppress.

THE COURT: What happened to it?

\* \* \* \* \* \*

I asked Mr. Coiro whether there were any motions pending when the case came in this part and he said there was only one motion and that was for a Wade hearing.

Is that correct, Mr. Coiro?

MR. COIRO: That's absolutely correct, Your Honor."

### VII.

"What happened" to LiPuma's suppression motion after Quagliata's May 16, 1972 appearance before Justice Leff until the May 2, 1974 commencement of LiPuma's trial remains to date a matter of some mystery. In an attempt to reconstruct the events that might provide an answer to that question, Quagliata would later rather vaguely recall that he had, at some point during the two-year period, joined in Hochheiser's motion either on the record or off the record with the consent of the Assistant District Attorney then in charge of the case against LiPuma and his co-defendants. But neither the state court stenographic transcripts nor the former prosecutor's best recollection would confirm Quagliata's memory. Nor, for that matter, does it appear that either Quagliata or Coiro had, with respect to the suppression motion, ventured by personal inquiry beyond the intelligence garnered from the defendants' private investigator, Hochheiser, or the co-defendants themselves during the two years

preceding LiPuma's trial. What is clear enough, however, is co-counsel's failure to press a hearing on the motion prior to trial.

Coiro, for his part, would later recall that "I am a pretty busy trial lawyer, on trial most of the time. I had forgotten what Mr. Quagliata had told me, that he joined in the motion orally before one of the judges."

By the time of LiPuma's trial, Coiro had in fact forgotten the suppression motion entirely; in advance of trial, he had consulted his case file, but it had not reflected the pendency of such a motion.

### VIII.

Having participated in lengthy and frequent sidebar discussions with counsel during the preceding days, Justice Fraiman finally resolved on May 8, 1974 that defendant's motion to suppress—which he himself had earlier characterized as a matter "go[ing] to the heart of the People's case"— could not be considered mid-trial. The Court was bound to deny a hearing on the motion, Justice Fraiman concluded, by the terms of Section 710.40 of the New York Criminal Procedure Law. The statute at that time provided in relevant part:

"1. A motion to suppress evidence must be made \* \* \* with reasonable diligence prior to trial.

2. The motion may be made for the first time during trial when, owing to previous unawareness of facts constituting the basis thereof or to other factors, the defendant did not have reasonable opportunity to make the motion before trial \* \* ."

Justice Fraiman determined that Section 710.40 did not comprehend the circumstances before him and that it thus would not accommodate a hearing on the proposed motion, raised as the latter was after the trial had begun. An embarrassed Quagliata and a discomfited Coiro were hardly able to suggest otherwise. For Thomas LiPuma, defense counsel's remembrance had come too late.

## IX.

In view of the narrative ground traversed above, the second and third claims raised by the instant petition need not detain us long. Petitioner has argued that the admission of evidence with respect to items allegedly stolen from the Robinsons and found in the rooms occupied by him—evidence presented in connection with indictment counts ultimately dismissed—so prejudiced his defense on the remaining counts that due process was denied by the trial court's refusal to declare a mistrial; according to petitioner, due process was not salvaged by the trial court's curative instructions following its dismissal of all counts involving the Robinson burglary. Petitioner has further argued that the prosecutor's summation was so larded with outrageously improper remarks that defendant LiPuma was in consequence denied his right to a fair trial. Neither of these contentions, however, is adequately supported by the trial court record.

■ It is true enough, as petitioner has noted, that, although it is

"the general rule that striking evidence erroneously admitted ordinarily cures the error, * * * ' * * * there may be instances where such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission, and in that case the general objection may avail on appeal or writ of error'." *United States v. Parks,* 411 F.2d 1171, 1172–73 (1st Cir. 1969), *quoting Throckmorton v. Holt,* 180 U.S. 552, 567, 21 S.Ct. 474, 45 L.Ed. 663 (1901).

Nevertheless, it is equally true that the accused admissions in the instant case were scarcely matters that a jury might not reasonably have been expected to purge from its collective mind. What is even more to the present point, however, is the inevitable conclusion that petitioner's defense was damned by overwhelming evidence wholly apart from that addressed to the Robinson burglary; petitioner thus can hardly be heard to claim as a result of the latter admissions a prejudice of constitutional dimensions.

■ The above observation is similarly fatal to petitioner's further argument. The trial court record discloses that the accused commentary by the prosecutor—some twelve remarks that included, *inter alia,* references to an "impossible defense" and an "overwhelming" prosecution case, the characterization of defense witness Doyle as a "congenital liar," a suggestion of fabrications by defense counsel, an allusion to defense counsel's representation of a "criminal" and an entreaty to the jury to convict "in the name of the People of the State of New York, in behalf of Helen Geibel and some pretty great cops"—was, to be sure and at the least, a compendium of rhetorical transgressions. Nonetheless, these ill-conceived flourishes of oratory must be viewed "in the context of the entire trial." *United States v. White,* 486 F.2d 204, 207 (2d Cir. 1973). The defense was essentially devoted—principally via Doyle's rather muddled testimony—to the proposition that Doyle and Raimondo alone had committed the Geibel burglary, *i. e.,* that Mrs. Geibel had seen not three, but two burglars, and that LiPuma had been the unhappy victim of perverse circumstance. In the light of the prosecution evidence that had preceded it, such defense was an efficient engine of its own undoing. Thus, in such a posture, the LiPuma defense could not have suffered a constitutionally proscribed impairment by force of the prosecution summation that impugned it.

## X.

■ We return from the above analytic detour to the central avenue of our inquiry—*i.e.,* petitioner's charge of ineffective assistance of counsel. This Court begins that inquiry wholly mindful, as it must be, that such claims stand in the shadow of a history of notably rare success, particularly in this Circuit. Compare, *e. g., United States ex rel. Walker v. Henderson,* 492 F.2d 1311 (2d Cir. 1974); *Massimo v. United States,* 463 F.2d 1171 (2d Cir. 1972); *United States ex rel. Marcelin v. Mancusi,* 462 F.2d 36 (2d Cir. 1972), *cert. denied,* 410 U.S. 917,

93 S.Ct. 977, 35 L.Ed.2d 279 (1973); *United States v. Matalon,* 445 F.2d 1215 (2d Cir.), *cert. denied,* 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 93 (1971); *United States ex rel. Scott v. Mancusi,* 429 F.2d 104 (2d Cir. 1970), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1385, 28 L.Ed.2d 651 (1971), with *Mosher v. LaVallee,* 491 F.2d 1346 (2d Cir. 1974); *United States ex rel. Thomas v. Zelker,* 332 F.Supp. 595 (S.D.N.Y.1971). Understandably enough, the standard against which an inadequacy-of-counsel claim must be measured is an extremely rigorous one. After all, in the sights of a convicted defendant, the judgment against him may well stand as incontrovertible proof that his counsel was "inadequate" to his case. A consequent habeas corpus petition may thus constitute no more than a misguided vehicle for a defendant who

> "freely equates lack of success in his criminal defense with counsel incompetency, and illogically and irrationally blames his predicament, which is primarily of his own doing, upon the inability of counsel to extricate him." *Slawek v. United States,* 413 F.2d 957, 958 (8th Cir. 1969).

Thus, to prevail on a claim of constitutionally inadequate representation, a petitioner—at least in this jurisdiction—must meet the burden of proving that his counsel's performance was so "woefully inadequate 'as to shock the conscience of the Court and make the [resultant] proceedings a farce and mockery of justice'." *United States v. Currier,* 405 F.2d 1039, 1043 (2d Cir.), *cert. denied,* 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969), *quoting United States v. Wight,* 176 F.2d 376, 379 (2d Cir. 1949), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950). Indeed, only "[i]f counsel's representation is so 'horribly inept' as to amount to 'a breach of his legal duty faithfully to represent his client's interests'," will a reviewing court be satisfied that "there has been a lack of compliance with the fundamental fairness essential to due process." *United States ex rel. Maselli v. Reincke,* 383 F.2d 129, 132 (2d Cir. 1967), *quoting Kennedy v. United States,* 259 F.2d 883, 886 (5th Cir. 1958), *cert. denied,* 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982 (1959). That heavy burden will not be borne successfully absent, at the least, a showing that "counsel was both grossly incompetent, and that 'the essence of a substantial defense' was thereby blotted out." *United States ex rel. King v. Schubin,* 522 F.2d 527, 529 (2d Cir.), *cert. denied,* 423 U.S. 990, 96 S.Ct. 403, 46 L.Ed.2d 309 (1975), *quoting United States ex rel. Testamark v. Vincent,* 496 F.2d 641, 643 (2d Cir. 1974), *cert. denied,* 421 U.S. 951, 95 S.Ct. 1685, 44 L.Ed.2d 105 (1975).

Decisional precedent in this Circuit makes it clear that " '[e]rrorless counsel is not required,' * * * and 'tactical errors or mistakes in strategy,' * * * even if established, will not suffice to meet the high burden placed on the [petitioner]." *United States v. Matalon, supra,* at 1218–19, *quoting United States v. Garguilo,* 324 F.2d 795, 796 (2d Cir. 1963). Moreover, as indicated above, it is a familiar principle that the inadequacy-of-counsel question has invariably as its point of reference "the character of the resultant proceedings." *United States v. Wight, supra,* at 379; see *United States ex rel. Crispin v. Mancusi,* 448 F.2d 233, 237 (2d Cir.), *cert. denied,* 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971).

This Court concludes that the stringent standard outlined above is satisfied by the sins of counsel's omission that were visited upon petitioner in the state trial court. It must be noted, at the outset, that this Court is by no means impelled to that conclusion by force of the fervent and abject confessionals of counsellors Coiro and Quagliata themselves. In the legal profession, as elsewhere, it is often the most able and conscientious practitioner who is most readily prompted to contrition for errors real or imagined, substantial or trivial. The degree of self-abasement by counsel himself thus is simply not the constitutional measure of a claimed incompetence. See *United States ex rel. Testamark v. Vincent, supra,* at 642.

Moreover, in recognizing the magnitude of petitioner's claim herein, this Court

need not conclude that petitioner's former counsel were, or are, "horribly inept" in their general practice of the law. It is, after all, an unhappy fact of judicial life that "[l]imitations of time, space and the finite mind apply even to lawyers," *United States v. Dardi,* 330 F.2d 316, 328 (2d Cir. 1964)—and, for that matter, to judges as well. Hence, occasional lapses of memory or incidents of oversight may be expected of the competent as well as their less gifted and diligent brothers. It is only when an attorney's forgetfulness or inattention exacts an outrageous cost to his client that the attorney's conduct amounts to a constitutional deprivation. *Cf. United States ex rel. Maselli v. Reincke, supra.*

◼ Nor does this Court fault petitioner's former counsel for a failure "to 'make every motion in the book' in the hope that one [might] succeed." *Harried v. United States,* 128 U.S.App.D.C. 330, 389 F.2d 281, 286 (1967). As the Supreme Court has had occasion to note, "[o]ften the interests of the accused are not advanced by challenges that would only delay the inevitable date of prosecution." *Tollett v. Henderson,* 411 U.S. 258, 267–68, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973), as quoted in *United States v. Yanishefsky,* 500 F.2d 1327, 1332 n. 1 (2d Cir. 1974).

◼ The present case, however, is not one in which "there were no circumstances revealed to [defense counsel] by [defendant] or anyone else which [would] indicate[ ] that an illegal search and seizure had been made by the police." *United States ex rel. Boucher v. Reincke,* 341 F.2d 977, 981 (2d Cir. 1965). Nor is this a case in which a suppression motion by defendant would have been of obvious futility. See, *e. g., United States v. Yanishefsky, supra,* at 1331; *United States v. Sanchez,* 483 F.2d 1052, 1057 (2d Cir. 1973). Rather, the record discloses that Coiro and Quagliata had had sufficient reason to determine—and, indeed, they had in fact determined—that a suppression motion by LiPuma would not be foredoomed, *i. e.,* that, on a hearing of such a motion, the People might not have been able to bear its "heavy burden" of

proving consent to the search and seizure in Suite 613. *People v. Whitehurst,* 25 N.Y.2d 389, 306 N.Y.S.2d 673, 254 N.E.2d 905 (1969).

Respondent's reminder that, in the face of an "overwhelming" prosecution case, "there is not too much the best defense attorney can do," *United States v. Katz,* 425 F.2d 928, 930 (2d Cir. 1970), is singularly misdirected to the circumstances presently under consideration. The prosecution's case against LiPuma drew its strength from two mutually reinforcing sources: Mrs. Geibel's testimony, on the one hand, the evidence derived from the search of Suite 613, on the other. To eviscerate that case, clearly more than a *Wade* hearing was needed. Thus, had a suppression motion been pressed to a timely conclusion, and had it been successful, the prosecution's evidence would have pared down to—at best—the identification of defendant by an elderly witness whose direct observation of "the stranger sitting at the desk" had lasted no longer than seconds, whose line-up identification of LiPuma had occurred under somewhat suggestive conditions, and whose husband, at the line-up, had been unable to identify LiPuma as "the stranger" whom he had earlier observed during a significantly longer period than had his wife. The "road not taken" in the present case had thus been critical to the LiPuma defense: only the stark picture of LiPuma, crouched inside the Berkshire closet, huddled close to Raimondo and hence to the Geibel pill box, was enough to confirm the otherwise dubious Geibel testimony and to foreordain LiPuma's conviction.

Respondent suggests, however, that the default now in question was no more nor less than a deliberate choice of trial strategy by defense counsel and, as such, one which this Court may not properly second-guess. See, *e. g., United States v. Yanishefsky, supra,* at 1332; *United States ex rel. Walker v. Henderson, supra,* at 1314; *United States v. Matalon, supra,* at 1219. But respondent does not identify—nor does this Court independently divine—any possible tactical altar at which LiPuma's suppres-

sion motion might have wittingly been made a sacrifice. See *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This Court is convinced, rather, that—as had been clear from the first—the LiPuma defense had had nothing to lose and possibly everything to gain from a timely motion to suppress. That motion was not in truth abandoned through the considered choice of defense counsel and client; it was, instead, somehow lost to petitioner in the chasm apparently formed by the division of co-counsel's labors.[3]

## XI.

■ This Court thus concludes that the charge of ineffective assistance of counsel—always serious in its implications, but most often unwarranted—is fully supported by the peculiar facts disclosed by the record at bar. Whether the inadequate state court representation demonstrated in the present case will in turn support a grant of the relief sought by petitioner must depend upon whether counsel's incompetence may be deemed to have been, beyond a reasonable doubt, "harmless" in the end. As this Court has earlier indicated, a suppression motion by LiPuma would have presented the state trial court with what was, at the least, a close question; it thus cannot be concluded beyond a reasonable doubt that the motion, had it been advanced, would have ultimately failed. And, as this Court has already observed, had LiPuma prevailed on the motion, the remaining prosecution evidence would not have been of sufficient

weight to have foreclosed the possibility of LiPuma's acquittal. Hence the reasonable possibility of prejudice to petitioner as the result of his counsel's glaring neglect is clear. The judgment of conviction accordingly must be vacated, and the writ of habeas corpus will be granted unless respondent commences proceedings, within sixty (60) days of the date hereof, to afford petitioner a new trial.

SO ORDERED.

## SUPPLEMENTAL MEMORANDUM AND ORDER

The above-captioned habeas corpus petition was the subject of a September 24, 1976 Memorandum and Order in which this Court, concluding that petitioner had been denied effective assistance of counsel during the state court proceedings that culminated in his conviction for burglary and petit larceny, ruled that "the judgment of conviction * * * must be vacated and the writ of habeas corpus will be granted unless respondent commences proceedings, within sixty (60) days of the date hereof, to afford petitioner a new trial." Presently before the Court is respondent's motion, under Rule 59(e) F.R.Civ.P., to alter or amend that Order.

A full exposition of the background to the above-captioned proceedings appears in the September 24 Memorandum and, for present purposes, need not be recited anew. It must be noted at the outset, however, that this Court's ruling turned upon the failure—born of neglect and/or oversight—

---

**3.** Respondent would have this Court conclude that the operation of New York procedural law forecloses petitioner from indirectly reviving his Fourth Amendment claim via his charge of ineffective counsel. Thus, respondent argues, petitioner cannot be heard to complain of the loss of his suppression motion because, under Section 710.40 of the New York Criminal Procedure Law, he had failed—through his counsel—to prosecute that motion in timely fashion. To allow petitioner to assert that claim presently, according to respondent, would be to subvert New York policy as reflected in the state statute.

The above argument is mentioned only to demonstrate that it has not been overlooked. It is a

curious legal theory indeed that would have a constitutional right irretrievably lost to a criminal defendant by force not of his own knowing and voluntary waiver, but rather, of his counsel's default through neglect—the very outrage of which petitioner now complains. As for respondent's invocation of a purported New York policy to be vindicated, it is enough to note that via an amendment to Section 710.40 —effective within months of petitioner's trial— New York law would now allow the trial judge, in his discretion, to hear a motion raised under the circumstances reflected in the present case. See New York Criminal Procedure Law Section 255.20.

of petitioner's trial counsel to press a pretrial suppression motion that had been potentially "critical to the Li Puma defense." At 791. Respondent urges the Court to amend its Order to the extent that the latter, as presently framed, grants "inappropriate relief."

This Court agrees that its earlier ruling appears to provide petitioner more than is due him under the circumstances of this case and, indeed, more than the Court meant to allow. The Court had intended only to restore to petitioner what had been lost to him through his trial counsel's incompetence, i. e., an opportunity to challenge the admissibility of certain evidence allegedly the product of an invalid search and seizure. It had surely not been this Court's intention to require a retrial of petitioner were the Li Puma suppression motion to prove unsuccessful; the failure of such motion would, after all, demonstrate that petitioner had suffered no ultimate prejudice, notwithstanding his counsel's inattention. Nor had this Court intended that, were the Li Puma suppression motion to prove successful, respondent would be bound to proceed with prosecution without benefit of those portions of the former trial record that would remain admissible at the subsequent trial.

With at least so much clarified, there remains for consideration respondent's present assertion that Li Puma lacked standing to make the contemplated motion to suppress. In proposed support of that argument, respondent cites *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), *United States v. Humphrey*, 409 F.2d 1055 (10th Cir. 1969), and *Craft v. United States*, 403 F.2d 360 (9th Cir. 1969).

■ This Court has thoroughly reviewed each of those decisions and finds nothing therein that might reflect credit upon the proposition submitted by respondent, i. e., that Li Puma lacked standing to move against any and all fruits of the allegedly illegal police entry into Suite 613, in which he was undisputedly a guest of the lawful occupant, because he had secreted himself (with his host's knowledge and consent) within a closet located in that suite (the better to be shielded from the allegedly illicit view of the police).

Indeed, the *Jones* decision from which respondent would enlist support could hardly establish more firmly that "anyone legitimately on premises where a search occurs" —including a "guest" or "invitee"—"may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." 362 U.S. at 267, 80 S.Ct. at 734. Perhaps understandably enough, respondent has failed to direct this Court to any authority for the proposition that one may lose such standing by removing himself speedily to a particular location, betraying a particular motive, within the premises lawfully occupied by him. In the absence of binding authority or persuasive reasoning from a litigant, this Court declines to subscribe to the thesis that standing, in the legal sense at least, is perforce inconsistent with running.

■ Respondent has further argued that Li Puma lacked standing to move for suppression of a pill box found on the person of his companion in Suite 613, on the ground that "fourth amendment rights are personal rights which can not be vicariously asserted * * *." Respondent's Brief at 4. Respondent would do better to understand the principle thus recited and/or at least the case to which it is presently addressed. Unhappily, this Court is now obliged to point to what should be glaringly apparent: it is the alleged invasion of petitioner's *own* privacy—through the initial, allegedly illegal, entry by the police—from which petitioner derives his standing to move against all fruits of the search in Suite 613.

■ This Court is obliged, further and finally, to note respondent's assertion that, "The only item of evidence [derived from the challenged search] ultimately found to be usable against petitioner was the Gei-

794

bels' pillbox." Respondent's Brief at 3. Earlier briefs demonstrate that respondent is in fact familiar with the trial testimony of the police officers who participated in the search of, and seizure in, Suite 613, including those portions directed to the incriminatory self-concealment of Li Puma. If respondent had been initially unaware that evidence subject to suppression on fourth amendment grounds may be of a testimonial—as opposed to physical—nature, it might ordinarily have been assumed that the *Wong Sun* decision cited by respondent would have been an immediate source of the needed enlightenment. See 371 U.S. at 485–86, 83 S.Ct. 407.

Petitioner is directed to submit a proposed order amending this Court's September 24, 1976 Order as indicated above. Respondent's motion is otherwise denied.

SO ORDERED.